No. 41,946

DALE COFFMAN and HAROLD COULTER, *Appellees*, v. LOIS HARRIS, R. L. MENDENHALL, SETH W. HERNDON and BETTY L. MENDENHALL, *Appellants*.

(358 P. 2d 673)

Opinion filed January 21, 1961.

*John M. Wall*, of Sedan, argued the cause and was on the briefs for appellants R. L. Mendenhall and Betty L. Mendenhall.

*J. A. Herlocker*, of Winfield, argued the cause, and *Harry O. Janicke* and *Robert L. Bishop*, of Winfield, were with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action in tort to recover damages resulting from the negligence of the appellants, R. L. Mendenhall and Betty L. Mendenhall, in allowing oil to escape from a well located in a pasture where the plaintiff's cattle were pastured under the terms of a written contract with the defendant Lois Harris. The Mendenhalls are residents of Emporia, Lyon County, and the defendant Lois Harris resides at Cambridge, Cowley County. The action was filed in Cowley County and was tried by a jury which returned a verdict against the defendants Mendenhall in the sum of $3,000, but found in favor of the defendant Lois Harris. Service of summons was not had upon Seth W. Herndon and he was not a party to the action. The Mendenhalls are the sole appellants.

Pertinent portions of the evidence are summarized: The Schroeder pasture leased by Harris to the plaintiffs during the pasture season of 1958 is located partly in Elk County and partly in Cowley County. During the latter part of 1954 the appellants acquired an oil and gas lease on that part of the Schroeder pasture located in Elk County and drilled a marginal producing well on the leasehold in March or April, 1955. The well was pumped for a time, and was abandoned and plugged in January 1958 under the direction of the state plugger, an employee of the Conservation Division of the State Corporation Commission. In the early part of March, 1958, the casing, tubing and rods were pulled, and while still covered with oil were stacked near the well location. When the well was drilled a slush pond about ten or twelve feet wide and twenty to thirty feet long was dug near the well site which was used in drilling the well. The pond was not used again until the well was plugged when mud and water were mixed and used for circulation to ease the pulling of the casing. The tank battery was located south of the well site on top of a hill and was plainly visible. A graveled road ran through the pasture from which the well site could be seen, but to inspect the well one had to leave the graveled road.

Defendant Harris had pastured cattle on the Schroeder pasture for several years prior to and including 1957, with the exception of 1956. Oscar Keplinger, an employee of Harris, inspected the pasture in the spring of 1958, and prior to contracting to pasture the plaintiffs' cattle that year he went over the pasture with the plaintiffs, but did not take them to the well site.

On April 12, 1958, Harris entered into a written contract with the plaintiffs to pasture 130 head of steers commencing April 15, and ending October 15, 1958, and agreed to "furnish pasture for same" and "care for and return said cattle." The cattle were healthy and in good condition, and averaged 550 pounds when they were placed in the pasture on April 15.

On May 13, Keplinger found one dead steer and another one on May 23, and he thought lightning had killed them. The latter part of May or early June Keplinger found four more dead steers and noticed that others were sick. He called the plaintiffs who immediately called Mendenhall and advised him that some of the cattle were dead and others were sick as a result of having drunk oil from the slush pond. Mendenhall advised them there was no oil on the lease or on the pond. On June 2, 1958, the plaintiffs took a veterinarian to the pasture and they observed the cattle had been licking and chewing on a part of the wooden tank battery. They followed a pipeline to the well site and found many hoof marks around the site and around and in the pond, and a scum of oily substance covering about 25 percent of the pond. The next day the cattle were rounded up and put in a small enclosure where the sick ones were treated. The veterinarian testified that oil could be seen on the cattle's legs around their hoofs; that they were passing oil through their bowels which showed on their tails and buttocks; that he diagnosed the sickness as ingestion of oil which affected the cattle by increasing their temperature causing diarrhea; that they would not eat or drink properly, and lost weight rapidly. He treated the sick cattle, and testified that he did not know how many were sick and passing oil, but it was a fairly high percentage. Following the veterinarian's diagnosis, Harris placed an electric fence around the pond and around the tank battery.

There was evidence that the general appearance of the cattle was not good. One witness testified that, "The thing I noticed about them was their hair, it didn't look good and they, well, they didn't feel good, you could tell they didn't, they were sick cattle." And, in answer to whether there was any word in the cattle business to describe generally their condition, the witness said, "Well, we say the hair's turned wrong side out, they're not slick, they don't look thrifty."

The cattle were not salable as a group on October 15, and to put them in the condition the plaintiffs contended they should have

been in, they incurred expenses for care, extra feed and extra help prior to their sale on December 19, 1958.

At the close of the plaintiffs' case, both Harris and the appellants demurred to the plaintiffs' evidence which was overruled.

Thereafter evidence was introduced on behalf of the appellants and Harris, including that of a veterinarian to the effect that he was out to the pasture and observed between six and ten head of cattle; that the unhealthy ones did not graze as much as the healthy ones; that he did not examine the cattle close enough to make any statement on the condition of the herd, and had no opinion as to how much oil they had drunk. R. L. Mendenhall testified that he went to the well site the next day after one of the plaintiffs called him; that he saw oil on the pond and took samples from it; that he delivered the samples to a consulting chemist in Wichita for analysis. The chemist testified that he received the samples of water and black oil and analyzed them; that they contained nothing that would have any deleterious effect upon the tissues or the system of an animal; that the oily substance was chemically inert and inactive and was nontoxic; that the substance contained in the samples would have no general effect upon an animal unless consumed in extraordinary large quantities, and that if an animal drank as much as the sample, it wouldn't hurt it.

Following the jury's verdict, the appellants moved for judgment notwithstanding the verdict, which was overruled. Thereafter, they timely filed a motion for a new trial, which likewise was overruled. Hence, this appeal.

The appellants contend their motion for a new trial should have been sustained. That motion, containing eight grounds, was heard on November 20, 1959, and taken under advisement by the court which overruled it on December 10, 1959. Each ground asserted in the motion for a new trial has been fully examined by this court and we cannot say the trial court erred in overruling that motion.

The appellants also contend that the verdict of the jury was contrary to the evidence. The point is not well taken. In addition to what has generally been said concerning the evidence, we deem it unnecessary to detail the testimony of each witness. This was essentially a fact case. The jury observed the witnesses and heard them testify, and when we consider the testimony, giving it the benefit of all inferences that may properly be drawn from those portions favorable to the plaintiffs which we are required to do,

even though some of the evidence was conflicting, we are compelled to say that there was ample evidence to support the jury's verdict in favor of the plaintiffs.

Other points raised by the appellants have been carefully reviewed and we conclude they do not warrant a reversal.

When considered in the light of the record presented, we are convinced that the appellants, in all contentions urged with respect to the matters relied upon for reversal of the judgment, have failed to establish error, or make it affirmatively appear there was irregularity in the case which prejudicially affected their substantial rights. That being the case, this court has no alternative and is compelled to sustain the judgment entered by the trial court. Indeed, the unequivocal language of G. S. 1949, 60-3317, as well as the many decisions construing it (West's Kansas Digest, Appeal and Error, § 901; Hatcher's Kansas Digest, Rev. Ed., Appeal and Error, § 583) require that it be done.

The judgment is affirmed.