No. 56,195

Scott P. Thurner and Riviera Drilling and Exploration Co., *Appellants,* v. Dale L. Kaufman and Mary H. Kaufman, *Appellees.*

(699 P.2d 435)

Opinion filed May 10, 1985.

*Robert Pennington,* of Henshall, Pennington, Brazil & Marvin, of Chanute, argued the cause, and Jack Marvin, of the same firm, was with him on the brief for appellants.

*O. J. Connell, Jr.,* of Connell & Connell, of El Dorado, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal by Scott Thurner and Riviera Drilling & Exploration Company (plaintiffs-appellants) from the judgment of the trial court cancelling their oil and gas lease with, and awarding damages to, Dale L. and Mary H. Kaufman (defendants-appellees). The Court of Appeals in an unpublished decision filed October 25, 1984, affirmed the trial court's ruling, holding the lessees had forfeited the lease by failing to comply with a covenant restricting their use of the land even though the lease contained no express forfeiture provision. We granted review.

On September 13, 1979, the defendant-lessors and the lessees' predecessor-in-interest executed an oil and gas lease covering approximately 757 acres of defendants' land. On August 20, 1981, plaintiffs Riviera Corporation and Scott Thurner each received, by assignment, a 50% working interest in the original lease. At the time the plaintiffs acquired their interests there were two open wells on the property in the southwest quarter and two existing gas wells in the northwest quarter.

The lease between the parties was a standard Form 88 (Producer's Special Shut-in), but included eight paragraphs of "Special Agreements" between the parties. The lease did not specifically provide for forfeiture or cancellation as appropriate remedies for breach of any lease provision.

Under the terms of the lease, delay rental for the calendar year 1982 was due on December 31, 1981. Accordingly, lessees repeatedly tendered payment before that date to both the defendant-lessors and to their depository bank, but lessors refused to accept payment. The lessors refused payment of the delay rentals because they considered the lease to have been breached, and thus voided, by the lessees' actions and omissions which resulted in serious damages to the lessors' land and cattle.

On March 22, 1982, because of their belief that the lease was no longer valid, the lessors locked the entrance gate to prevent the lessees' entrance onto the leasehold. Thereafter, on March 26, 1982, lessees filed an action for damages and to enjoin lessors from preventing their entrance to the leasehold. On the same date a temporary restraining order was issued against the defendants ex parte. The lessors on April 21, 1982, filed a counterclaim in which they sought damages and cancellation of the lease for violation of its specific terms. The lessors claimed the

lessees had breached paragraph five of the "Special Agreements" contained in the lease, which provided:

"Lessee agrees to maintain during any activity on said leasehold a high degree of security to prevent the escape of livestock from fenced areas at lessee's access point. Lessee further agrees, in the event commercial production is at any future time attained under this lease to erect quality steel or aluminum gates permanently mounted at points agreed to by lessor and lessee as being located for best common benefit."

Lessors alleged that, although commercial production was begun in one well in February 1982, the lessees had failed to fence the oil pits or tank battery, causing the lessors' cattle to become covered in oil and to consume oil, and resulting in the death of one calf which fell in the oil pit. The lessors further alleged the lessees had breached the agreement by driving over the lessors' fence gate, causing cattle to escape. This action resulted in the loss of three cows and three calves.

The lessees in this case did not drill any of the wells on the premises but went into a hole previously drilled and obtained oil. After the second major oil spill on the premises, the lessors on November 3, 1982, filed an amended counterclaim to recover for damage to 30 head of cows and 15 calves, some of which were permanently damaged.

The case was tried to the court on July 14, 1983. The court found the lessees had negligently dumped salt water onto the land, resulting in $500 in damages to real estate. Also, the lessees had breached the leasing agreement, resulting in damage to cattle and fence gates in the amount of $6,250. The court further found that the delay rental for 1983 had not been tendered by December 31, 1982, in accordance with the terms of the lease. Thus, due to the lessees' breaches, the court ordered cancellation of the lease together with an award of $6,750 in damages. Court costs were to be paid by the lessees.

The plaintiffs appealed to the Court of Appeals claiming it was error for the trial court to: (1) cancel their lease where the lease itself did not provide an express remedy of termination for breach of its covenants, and (2) cite failure to tender 1983 delay rentals as one of the grounds for cancellation when such tender would have been a futile endeavor. In the Court of Appeals the plaintiffs did not challenge the finding that they were in breach of the lease, nor the award of, or amount of, damages. No issue is presented to this court on the award of damages.

The Court of Appeals, in deciding the first issue, reasoned that if the remedy at law (damages) is inadequate, equity will allow a forfeiture in order to prevent injustice. The Court of Appeals determined that even though the trial court had awarded the sum of $6,750 in damages, the lessors were still faced with the problem of the lessees' continuous disregard for the lessors' property. The lessees had repeatedly failed to protect the property after being warned and while under the protection of a temporary restraining order issued by the trial court which permitted the lessees to go onto the lessors' premises and conduct their operations. Even though the trial court did not specifically state that $6,750 in damages alone was inadequate, the Court of Appeals, after reviewing the record, found evidence supporting the judgment of the trial court.

In addressing the second issue, the Court of Appeals found it unnecessary to discuss the doctrine of futility in the context of the lessees' failure to tender the 1983 delay rentals because of a special provision in the lease which required the lessees to pay $1,500 for each of two wells on the property which were not producing at the end of the lease term. The Court of Appeals found that the lessees were required to tender an additional $3,000 at the end of 1982, which they did not do, and that in order to constitute a valid and sufficient tender, the lessees were required to tender all amounts due and owing. The Court of Appeals held that even if the lessees were excused from tendering the delay rental because of futility, they were still obligated to tender the $3,000. Therefore, the Court of Appeals determined the trial court reached the correct result (termination of the lease) for the wrong reason.

The primary issue we are called upon to review in this case is whether forfeiture for breach of an express covenant is a proper remedy in the absence of an express forfeiture provision in the oil and gas lease.

We recognize the oft-repeated maxim that "equity abhors a forfeiture" and will not enforce one where a less drastic remedy will satisfy the demands of justice. *Commercial Asphalt, Inc. v. Smith,* 200 Kan. 362, 367, 436 P.2d 849 (1968); *Alford v. Dennis,* 102 Kan. 403, 405, 170 Pac. 1005 (1918).

In 4 Williams, Oil and Gas Law § 673.3, pp. 182-83 (1984), it is stated:

"For breach of lease restrictions on the lessee's use of the surface, an action for *damages* suffered will lie. Alternatively, the restrictions may be enforced by a timely proceeding in equity to enjoin violation. . . . *Breach of the restriction is not grounds for forfeiture.*" (Emphasis added.)

Also, in 4 Williams, Oil and Gas Law § 673.4 (1984), it is stated that, for breach of a fencing agreement and a covenant requiring the pipe to be buried, the only remedies are an action for damages or relief in equity. Forfeiture is not stated as being a possible alternative remedy.

It is generally recognized that damages may be awarded for injury to the lessor's land and cattle based on negligence in the absence of any specific covenant in the lease. 1 Williams and Meyers, Oil and Gas Law § 218.10 (1984). The lessee's allowance of the overflow of pollutive substance upon the land is a common situation where courts have found liability based on negligence. See *Coffman v. Harris*, 187 Kan. 516, 358 P.2d 673 (1961); Scott, *Oil and Gas Lease Clauses Relating to Surface Damage and Use of the Surface*, 13 Rocky Mtn. Mineral Law Inst. 317, 320 (1967). In the instant case, the trial court awarded damages for the lessees' negligence in dumping salt water on the lessors' land and in permitting oil to escape and flow on the lessors' land, all of which caused damages to the lessors' land and cattle.

It has been recognized that the lessee may also be liable for damage caused by cattle consuming oil from, or falling into, an unfenced pit, despite the absence of an express provision requiring fencing, if the lessee's failure to fence was due to negligence. 4 Summers, Oil and Gas § 652, pp. 38-40 (perm. ed. 1962). Where liability is found to exist based on negligence, the remedy is compensatory damages. Additionally, in cases of wanton disregard of the interests of the surface owner, punitive damages may be awarded. *Jensen v. Sierra Petroleum Co.*, 189 Kan. 472, 370 P.2d 425 (1962); *Wendtlandt v. National Cooperative Refining Ass'n*, 168 Kan. 619, 215 P.2d 209 (1950).

Under an oil and gas lease, the lessee has the implied right to make reasonable use of the surface in order to develop the land for the oil and gas. When this use is overreached and becomes injurious to the lessors' agricultural pursuits, courts have displayed great willingness to step in and impose liability despite the lack of any express provision. This indicates the importance

courts place on the right of a lessor to conduct a farming business free from injury or interference.

Although courts have shown an unwillingness to declare forfeiture for breach of express provisions which limit the lessee's use of the surface, forfeitures have been granted, in the absence of an express forfeiture clause, in other situations. For instance, this court has awarded cancellation for breach of the implied covenant to develop and for abandonment. See *Rook v. James E. Russell Petroleum, Inc.,* 235 Kan. 6, 679 P.2d 158 (1984); *Shaw v. Henry,* 216 Kan. 96, 531 P.2d 128 (1975); *Vonfeldt v. Hanes,* 196 Kan. 719, 414 P.2d 7 (1966); *Brinkman v. Empire Gas & Fuel Co.,* 127 Kan. 551, 274 Pac. 277 (1929); *Howerton v. Gas Co.,* 81 Kan. 553, 106 Pac. 47 (1910). In *Howerton,* this court stated, "If the remedy in damages is impracticable and a forfeiture in the given case is not unconscionable, and the forfeiture must be decreed to prevent injustice, the power of a court of equity to grant it can not be doubted." 81 Kan. at 561.

In examining the cases in which courts have awarded cancellation for breach of an express or implied covenant in the absence of a forfeiture clause, we find that the breach went to an "essential" part of the lease. For instance, courts have found the implied covenant to develop goes to the very heart of the lease, as does the express covenant to pay royalties. See, *e.g., Melancon v. Texas Company,* 230 La. 593, 89 So. 2d 135 (1956). Therefore, equity will, in fact, allow cancellation when damages are impracticable, and a forfeiture is required to prevent injustice.

In keeping with this line of reasoning, it appears to us the remedy of forfeiture is available where breach of surface right restrictions placed on the lessees, by specific provisions in the lease, are so flagrantly violated as to deny the lessors the use of the surface rights retained, thereby denying the lessors the right to pursue farming operations which are the lessors' means of livelihood. The importance courts place on restricting lessees in oil and gas leases to "reasonable" use of the surface has heretofore been stated. Therefore, in cases of continuous unreasonable use of the surface by the lessee, in the face of express conditions in the covenant restricting such use, the breach goes to an "essential" part of the lease.

In this case, the trial court awarded $6,750 in damages to the lessors for the lessees' *past* conduct concerning negligent injury

to the land and cattle. In addition, the court cancelled the lease for breach of the express covenant. Although the trial court did not make specific findings that damages were inadequate or that cancellation was an additional remedy necessary to prevent injustice to the lessors, the Court of Appeals concluded the specific findings made by the trial court were implied in reaching its decision.

In the absence of objection first made in the trial court, omissions will not be fatal to a judgment since the trial court is presumed to have found all of the facts in issue necessary to support the judgment. *Celco, Inc. of America v. Davis Van Lines, Inc.,* 226 Kan. 366, 369, 598 P.2d 188 (1979); *Shuler v. Lashhorn,* 67 Kan. 694, 700, 74 Pac. 264 (1903); *In re Lett & Jackson,* 7 Kan. App. 2d 329, 331, 640 P.2d 1294, *rev. denied* 231 Kan. 800 (1982). Here the record discloses no objection was made in the trial court.

The record is replete with evidence that the lessees did not comply with "Special Agreement" paragraph 5 and other requirements implied in an oil and gas lease. Three pits on the premises for the storage of salt water and oil were left open; the primary access gate consisting of wire was dropped to the ground, run over and consistently left open by employees of the lessees entering onto the premises—Mr. Kaufman estimated this occurred 25 to 30 times; some of the 80 cows and 80 calves on the premises for grazing repeatedly escaped through the open gate requiring a search and their return to the pasture; the tank battery for the storage of oil and the completed oil well were not fenced when a major oil spill occurred, and were not effectively fenced later until the lessors erected a fence around them; an employee of the lessees was seen by the lessors to open a valve on the 100-barrel test tank and drain salt water and some oil directly onto the land, which resulted in killing the native grass and fescue (the pumper for the lessees said he did this once a week); the major oil spill occurred Februrary 25, 1982, from cows rubbing on the control valve which opened while the tank battery was not fenced, causing about 30 cows and many calves to be covered with oil. A state inspector investigated and the attorneys for the respective parties stipulated 74.69 barrels of oil were picked up in clean-up. A veterinarian testified eighteen out of 80 cows and approximately the same percentage of calves

showed evidence of extensive oil consumption. The veterinarian testified the extent of this damage could not be determined until fall, and that the cows eating oil would not recycle for breeding, which would result in loss of calves for the next season. In September 1982 the cows and calves were removed from the pasture to avoid further damages to them. Ten calves were missing and 22 calves did not do well on feed, resulting in a decrease in the sales price of $150 each. The lessors testified from 20 to 30 cows did not recycle. When the lessors reported the oil spill to Mr. Newland, the employee of the lessees on the premises, and he was asked to look at the cows, he responded by saying he didn't give a damn about the cattle and would not waste his time. A second major oil spill occurred in the latter part of 1982 on an adjoining Blythe lease operated by the same lessees east of the lessors' premises. Oil flowed from this tank battery along a draw on the lessors' premises considerably more than 600 feet to the pond in the middle of the premises. As a result of the oil spills and drainage of salt water onto the land of lessors, ten acres of land were seriously damaged. Mr. Kaufman, a lessor, also testified clean-up operations ordered by the state inspector, who was on the premises six or seven times, were ineffective, with only about one inch of soil scraped off in some areas. The pumper testifed straw was hauled in to clean up the oil and after scraping the surface three truck loads of dirt were hauled in to cover the areas. Further evidence indicated a road used for access to the oil well on the lessors' premises was rutted out and that no metal gate, as required by the lease, was ever installed at the point of access.

The original employee of the lessees, Mike Adamski, who was placed in charge of operations on the lease herein, left the employ of the lessees in the first quarter of 1982, and Carl Newland, in charge of daily oil production and maintenance of oil wells and associated equipment, was left in charge. Mr. Newland testified he did not know the terms of the lease. The employee of the lessees in charge of the leasing operations, Ronald R. Retzlaff, residing in Longmont, Colorado, testified, as did Carl Newland, but Adamski, who Mr. Kaufman testified came onto the lease frequently with a woman assistant, did not appear to testify.

Accordingly, we hold due to the flagrant nature of the lessees'

breach of the covenant restricting their use of the surface, damages alone awarded to the lessors were inadequate and cancellation of the lease was the proper remedy to prevent an injustice to the lessors. Most of the flagrant disregard of the lessors' rights to the surface of the land retained by the lessors occurred after the lessees continued in possession of the lease under the protection of a court order. This, in our opinion, makes the conduct of the lessees more reprehensible.

While we need not address the second issue in order to affirm the trial court's decision, we will briefly address it to avoid confusion in the law on payment of delay rentals while a lawsuit challenging the validity of a lease is pending.

The trial court determined the lessees' failure to tender delay rentals for 1983 by December 31, 1982, was not excused by the doctrine of futility, and, thus, the lease had terminated. The Court of Appeals found it unnecessary to discuss the doctrine of futility in this context, because they found the lease had terminated by lessees' failure to tender payments due and owing under "Special Agreement" paragraph 8 by December 31, 1982. The Court of Appeals held that the trial court reached the correct result for the wrong reason.

We find the decisions of both the trial court and the Court of Appeals on this issue were erroneous.

The pertinent provisions of the lease provide:

"It is agreed that this lease shall remain in force until December 31, 1982 and as long thereafter as oil or gas or either of them is produced from said land by lessee; *provided said term may be extended as provided by Special agreement 2 below.*

. . . .

"If no well be commenced on said land on or before the 31st day of December, 1980, this lease shall terminate as to both parties, unless the lessee shall on or before that date pay or tender to the lessor or to the lessor's credit . . . the sum of Fifteen hundred Fourteen dollars which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively.

. . . .

"2. The primary term hereof shall be extended, at lessee's option, an additional one year term to December 31, 1983, by lessee's payment of a delay rental of $3.00 per acre on or before December 31, 1982, and shall be extended thereafter for an additional one year term to December 31, 1984, by lessee's

payment of an additional delay rental of $3.00 per acre on or before December 31, 1983.

. . . .

"4. [L]essee agrees to rework two wells drilled within the past two years.

. . . .

"8. In the event that either of the two wells described in special agreement 4, or both of them, are not brought into commercial production *during the term* of this lease, lessee shall pay to lessor the sum of One thousand Five hundred Dollars ($1,500.00) for each such well not brought into commercial production, as liquidated salvage value for the existing casing in such well or wells, which lessee shall have the right to remove and retain." (Emphasis added.)

In December 1981, the lessees tendered delay rentals which were refused by the lessors. In March 1982, the lessors locked the lessees out of the leasehold, maintaining that the lease had terminated. When the lessees filed suit, the lessors counterclaimed, alleging that the lease had terminated or had been forfeited. In December 1982, the lawsuit was still pending. Because the lessors were attacking the lessees' title under the lease, we hold it would have been a futile effort for the lessees to have tendered delay rentals in December 1982, and, accordingly, they were excused from doing so.

This rule for "excuse" due to an attack on title has been stated in 3 Williams, Oil and Gas Law § 606.6 (1984) as follows:

" 'Where a lessee under an "unless" oil and gas lease is ready, able, and willing either to develop the premises or to pay rentals, an attack upon the lessee's title by the lessor will relieve the lessee of the duty either to proceed with drilling operations or pay the delay rental specified in the lease during the continuance of the challenge to his title.' "

If the lease in this case had subsequently been found by the court to be valid, the lessees would have been permitted to make the payments within a reasonable time thereafter. *Jicarella Apache Tribe v. Andrus,* 687 F.2d 1324, 1342 (10th Cir. 1982).

Since the lawsuit excused the lessees from paying delay rentals, the primary term of the lease continued in effect under Special Agreement paragraph 2 as though the rent had been paid until the matter was determined. Under Special Agreement paragraph 8, as long as the lessees brought the existing wells into production during the term of the lease, they would not be liable for the $1,500 per well. Since the term had not yet expired, Special Agreement paragraph 8 was not in effect and the Court of Appeals erred in relying upon it.

In summary, the lease did not terminate by the lessees' failure to tender delay rental for 1983; however, the lessees forfeited the

lease in its entirety by a flagrant breach of an essential part of the lease.

The judgment of the Court of Appeals affirming the trial court is affirmed.