(842 P.2d 321)

No. 67,628

GEORGE and LINDA COLBURN, *Appellees,* v. PARKER AND PARSLEY
DEVELOPMENT COMPANY, *Appellant.*

—

Opinion
filed November 25, 1992.

*Joseph W. Kennedy* and *Robert W. Coykendall,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, and *Edward C. Hageman,* of Hageman & Hageman, of Stockton, for appellant.

*Gerald L. Green* and *Carol A. Zuschek,* of Gilliland & Hayes, P.A., of Hutchinson, for appellees.

Before LARSON, P.J., RULON, J., and JOHN E. SANDERS, District Judge, assigned.

LARSON, J.: This is a dispute over the contractual provisions of a saltwater disposal agreement and an oil and gas lease.

Parker and Parsley Development Company (Parker or lessee) appeals the court trial's judgment in favor of George and Linda Colburn (Colburns or lessors) in excess of $272,000 and declaratory relief requiring additional payments.

Parker contends (1) the oil and gas lease granted an implied right to drill and operate a saltwater disposal well on the leased premises without payment to the lessors; (2) the trial court's construction of the saltwater disposal agreement is contrary to its language and evidence of intent introduced at trial; and (3) the trial court erred by construing the saltwater disposal agreement so as to defeat the intent of one party to the agreement.

The issues are those of first impression to the Kansas appellate courts, and for a full understanding a detailed factual recitation is required.

The Colburns own a 40-acre tract on the east boundary of Stockton in Rooks County, Kansas. In 1981, they granted an oil and gas lease to G.N. Rupe, who thereafter drilled and completed four producing oil wells. Operators of producing oil wells located within the city of Stockton leased portions of the surface of the Colburns' properties for tank batteries, and were interested in a location to drill a saltwater disposal well as Stockton ordinances did not permit disposal of salt water within the city limits.

Rupe contended he had the exclusive right to control disposal of salt water on the leased premises. The Colburns disagreed. This resulted in negotiations between Rupe and the Colburns for the drilling of a well to be utilized for salt water disposal. Several drafts of the proposed agreement were prepared and a meeting was held in February of 1984 in Hutchinson, Kansas, between

the Colburns and their attorney, and Rupe and his accountant and attorney.

All parties agree there was no specific discussion at this meeting about salt water produced from the four Colburn wells on the premises covered by the oil and gas lease and "foreign" water, or that water produced off the leased premises.

Provisions from drafts prepared by both attorneys were utilized and, after negotiations, a saltwater disposal agreement was prepared and signed with the following provision applicable to this controversy:

"2. RENTAL PRICE AND PAYMENT TERMS. As consideration for the use of the LEASED PREMISES, RUPE shall pay to COLBURNS the amount of One and One-half Cents (1½¢) per barrel of liquid disposed into the subject disposal well. Should said salt water well not generate a minimum of One Thousand Dollars ($1,000.00) per year to the COLBURNS, COLBURNS shall have the right to cancel this lease, with thirty (30) days' written notice."

The parties established the priority for usage of the disposal well as follows:

"4. PRIORITY. RUPE agrees to offer disposal services to other operators in the surrounding area in a manner so as to maximize the income payable to COLBURNS. The priority for the disposal of water into this salt water disposal well shall be as follows:
A. Wells owned by the COLBURNS.
B. Wells owned by RUPE.
C. Wells of Operators whose tank batteries are located on the COLBURNS' property.
D. Other outside wells.
"RUPE represents that it will offer participation in the subject disposal well to third party operators of surrounding oil wells on a uniform basis subject to the above priority rights."

The saltwater disposal agreement also contained the following provision, which is referred to in this opinion as the subordination clause:

"THIS LEASE shall be operated by RUPE in a manner not to conflict with the rights and duties created by Oil and Gas lease and Surface lease for Tank Battery described on page 1 of this agreement. In the event there are conflicting rights and duties, this Lease shall be subordinate to said Oil and Gas Lease and Surface Lease for Tank Battery."

The portion of the oil and gas lease applicable to the issues within is the granting clause, which operates to

"grant, lease, and let exclusively unto the lessee the hereinafter described land . . . for the purpose of . . . drilling, mining, and operating for . . . oil . . . and for constructing roads, laying pipe lines, building tanks, storing oil, building power stations, telephone lines and other structures thereon necessary or convenient for the economical operation of said land alone or conjointly with neighboring lands, to produce, save, take care of, and manufacture all of such substances, and for housing and boarding employees . . . ."

In March of 1984, Rupe completed the saltwater disposal well and shortly thereafter transferred all of his interest to Damson Oil Corporation. The agreement between Rupe and Damson provides that Damson is not required to pay a charge for disposal of salt water from the four Colburn wells. The Colburns consented to the assignment, but a copy of the Rupe-Damson agreement was not furnished to them.

Damson operated the saltwater disposal well from June of 1984 until June of 1985, and paid the Colburns one- and one-half cents per barrel for salt water disposed of in the well produced by the four Colburn oil wells and wells located off the leased premises. At that point, Damson unilaterally determined it did not have the obligation to pay for the disposal of salt water produced from the Colburns' four wells and stopped doing so. The Colburns did not learn of this decision until March of 1987.

The Colburns demanded payment from Damson. Damson refused. The Colburns brought suit. Damson subsequently transferred its interest in the oil and gas lease and saltwater disposal agreement to Parker, the sole defendant herein.

Motions for summary judgment by both parties were denied and the matter proceeded to a court trial. The Colburns and their attorney testified it was clearly their intent that all barrels of liquid disposed of into the well should be paid for at the rate of one- and one-half cents per barrel regardless of the source.

Rupe, his accountant, and his attorney all testified the granting clause of the oil and gas lease gave Rupe the right to dispose of salt water from the leased premises at no cost and they had never heard of anyone paying for the disposal of on-premises water. Rupe's attorney admitted that saltwater disposal agreements normally distinguished between on-premises and off-premises water, but such was not the case in this agreement.

Two experienced oil operators testified that it was the custom and practice of the oil industry not to pay for the disposal of on-premises water. However, agreements produced by the experts specifically provided that disposal of off-premises water would be compensated for, while disposal of on-premises water would not.

An operations foreman for Damson testified that while paying for disposal of on-premises water would be contrary to normal oil field practices, his reading of the disposal agreement would require Rupe to pay for disposal of on-premises water.

The evidence included a letter written by Rupe to the Colburns during the early stages of negotiations offering 10% of the income from "all outside water." Parker argued this showed a clear intention to pay only for disposal of off-premises water. Testimony indicated that Rupe and his successors received 20 cents per barrel from other oil and gas operators for salt water disposed of from off the leased premises. The Colburns argued their acceptance of a lesser amount ($1\frac{1}{2}$¢) per barrel instead of 10% of 20 cents (2¢) per barrel indicated they were to receive the smaller per barrel payment for all salt water disposed of in the well.

Economic testimony showed Parker had received substantial amounts from off-premises operators for disposal of water, which substantially lowered the cost of operating the disposal well. However, if Parker was compelled to pay the Colburns for disposal of on-premises water, the economic life of the Colburns' lease would be reduced by at least one year with a resulting loss of oil and gas production and the income therefrom.

The trial court found no previous Kansas decision required a finding that the implied covenants of the granting clause included the right to inject salt water into the subsurface. The subordination provision was not deemed to be of assistance to the lessee because the granting clause did not refer specifically to injection of salt water, while the saltwater disposal agreement clearly stated the lessee would be obligated to pay one- and one-half cents per barrel for all liquid disposed of.

The trial court found that, notwithstanding the fact Rupe might have the right to dispose of on-premises water without payment, he negotiated a saltwater disposal agreement which gave him an additional valuable right to dispose of off-premises water to his economic benefit and in return thereof agreed to pay the Colburns for

all water disposed of. The trial court applied a rule of strict construction, normally applied to oil and gas leases, to the saltwater disposal agreement, and found that the agreement required the lessee to pay the lessor for all water disposed of, and then rendered a money judgment in favor of the Colburns and declared Parker obligated to pay for all future water disposed of.

Although we reach the same conclusion as the trial court, we do so for somewhat different reasons. We first decide whether one of the implied covenants of an oil and gas lease allows for disposal without cost of on-premises water, and then turn to the specific wording of the agreements and the evidence considered by the trial court in reaching its conclusion.

*Does a standard producers form 88 oil and gas lease permit an operator to drill and operate a saltwater disposal well on the leased premises in order to dispose of salt water produced from the operations of that lease?*

Parker contends that because production and disposal of salt water is a necessary incident to oil production the granting clause of the oil and gas lease permits it to drill and operate a saltwater disposal well, or, alternatively, that the lease by implication grants the right to dispose of salt water. Finally, Parker asserts that an oil operator has a statutory right to dispose of salt water.

The trial court determined that the granting clause did not include by implication the right of an operator to inject salt water into the subsurface. The trial court's determination is a conclusion of law over which this court has unlimited review. *Hutchinson Nat'l Bank & Tr. Co. v. Brown,* 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

We will not attempt to analyze the granting clause of various forms of oil and gas leases. While a 1962 version of the producers form 88 specifically speaks to injection of fluids into the subsurface, the 1942 version of the producers form 88 oil and gas lease involved herein does not. No express right to dispose of salt water is granted by this oil and gas lease.

Notwithstanding the absence of the express grant, Parker correctly asserts the right to dispose of salt water is created by implication and by statutory law. This right arises by the reasonable application of implied covenants to oil and gas leases, which have long been

recognized by our Kansas courts. For a historical discussion of cases involving implied covenants, see Cohen, *Implied Covenants in Kansas Oil and Gas Leases*, 9 Kan. L. Rev. 7 (1960).

The production of salt water from the Colburns' wells is a necessary and unavoidable result of the production of oil from this property. Trial testimony indicated the oil production is from the Arbuckle formation, which is water driven and initially produces a limited amount of water, but eventually produces huge quantities of water that Parker must safely and environmentally dispose of as a necessary and essential incident of the production of oil.

In *Shaw v. Henry*, 216 Kan. 96, 101, 531 P.2d 128 (1975), the Kansas Supreme Court affirmed a trial court finding that it was necessary to drill a saltwater disposal well in order to properly operate a lease.

The Supreme Court in *Mai v. Youtsey*, 231 Kan. 419, 424, 646 P.2d 475 (1982), quoted 1A Summers, The Law of Oil and Gas § 133, pp. 229-31 (1954 rev.) in holding an oil and gas lease creates by implication what is necessary to effectuate the grant:

" 'If in the grant or reservation of a separate interest in oil and gas the grantor does not expressly grant or retain such legal relations as are necessary for the production and operation of the land for oil and gas purposes, these relations are held to be created by implication.' "

See also *McLeod v. Cities Service Gas Company*, 131 F. Supp. 449 (D. Kan. 1955) (a mineral lessee may make reasonable use of leased land when carrying out legitimate object of the lease), *aff'd* 233 F.2d 242 (10th Cir. 1956); *Thurner v. Kaufman*, 237 Kan. 184, 188, 699 P.2d 435 (1985) ("Under an oil and gas lease, the lessee has the implied right to make reasonable use of the surface in order to develop the land for the oil and gas."); 1 Pierce, Kansas Oil and Gas Handbook § 9.20, p. 9-18 (1986) ("The lessee is typically granted the right to use the leased land to conduct exploration, development, and production activities. If the lease does not expressly confer such rights, they will be implied.").

Although Pierce recommends the right to dispose of substances through injection wells should be addressed in agreements separate from the oil and gas lease, he notes that, even without express grants, the oil and gas lessee has broad implied authority

to use the leased land to conduct operations. 1 Pierce, Kansas Oil and Gas Handbook § 12.05, p. 12-8.

There is a surprising lack of clear and specific holdings in this area from our sister states, but those that exist favor our finding that the drilling and operating of a saltwater disposal well is an implied covenant of an oil and gas lease. The factual basis of each case is not identical, but the uniform result supports our decisions. See *Leger v. Petroleum Engineers, Inc.,* 499 So. 2d 953 (La. App. 1986); *Feland v. Placid Oil Company,* 171 N.W.2d 829 (N.D. 1969); *Cumberland Operating Co. v. Ogez,* 769 P.2d 105 (Okla. 1988); *TDC Engineering, Inc. v. Dunlap,* 686 S.W.2d 346 (Tex. App. 1985). Our research indicated no case in which the standard oil and gas lease form had been construed to require payment by the lessee to the lessor for disposal of leased premises salt water.

In Kansas, the use of earthen pits for saltwater disposal, which undoubtedly resulted in pollution of fresh water strata, predictably led to control over saltwater disposal by legislative enactment. See Glicksman and Coggins, *Groundwater Pollution I: The Problem and the Law,* 35 Kan. L. Rev. 75, 167-68 (1986). In recent years, the Kansas Legislature has provided for control over the disposal of salt water in K.S.A. 1991 Supp. 55-901(a), which provides:

"The owner or operator of any oil or gas well which may be producing and which produces salt water or waters containing minerals in an appreciable degree shall have the right to return such waters to any horizon from which salt waters may have been produced, or to any other horizon which contains or had previously produced salt water or waters containing minerals in an appreciable degree, if the owner or operator of such well makes a written application to the state corporation commission for authority to do so, and written approval has been granted to the owner or operator after investigation by the state corporation commission."

The Kansas Corporation Commission has been directed to adopt rules and regulations governing saltwater disposal. K.S.A. 1991 Supp. 55-901(b). Additional provisions exist governing penalties for the unlawful disposal of salt water. K.S.A. 1991 Supp. 55-904, K.S.A. 1991 Supp. 55-1003, and K.S.A. 1991 Supp. 55-1004. Pierce now observes that by Kansas statutory law, saltwater dis-

posal wells in a producing formation are a matter of right. 2 Pierce, Kansas Oil and Gas Handbook § 13.71, p. 13-49 (1989).

We hold the granting clause in an oil and gas lease includes an implied covenant to dispose of the salt water produced during operations by utilizing a saltwater disposal well drilled on the leased premises without additional compensation to the lessor. We hold that such a right is required in order for the production of oil and gas to be accomplished. Salt water from the premises of an oil and gas lease may be disposed of or injected in accordance with the rules of the Kansas Corporation Commission without payment to the lessors, absent a specific leasehold provision which otherwise provides. This is one of the implied covenants of the standard oil and gas lease and also a statutorily established right.

*Is the trial court's decision contrary to the language of the saltwater disposal contract and evidence of intent introduced at trial?*

The trial court concluded that irrespective of Rupe's right to dispose of salt water produced from the Colburns' wells without payment, he negotiated for and obtained an agreement that gave him valuable additional rights for which the Colburns received an agreement requiring payment to them for all salt water disposed of into the disposal well.

The trial court further concluded that applying the subordination clause of the saltwater disposal agreement did not require judgment for Parker because there was no express right to inject salt water under the oil and gas lease while the saltwater disposal agreement clearly required payment for *all* water disposed of.

Parker's argument is strengthened by our finding that the right to dispose of salt water is one of the implied covenants of an oil and gas lease, but this does not require judgment in Parker's behalf.

The Colburns' argument is more persuasive in contending the subordination clause concerned only the actual operations of the oil and gas lease and not payment under its expressed terms. They contend that the intent of the subordination clause was that if operation of the disposal well interfered with actual production of the oil and gas lease, then production must continue and the disposal well must be limited in its operations.

The Colburns further contend that even if Rupe had the implied right to dispose of salt water free of charge, he negotiated away that right in consideration of the right to dispose of off-premisės water into the disposal well. The Colburns logically assert the saltwater disposal agreement clearly provides they are to be paid one- and one-half cents per barrel for all salt water disposed of down the well and that no conflict arises between the two agreements.

The Colburns further assert that paragraph four entitled PRIORITY, which is the only provision in the agreement that distinguishes between on-premises and off-premises water, only addresses the priority of disposal and does not affect the payment terms of paragraph two. Both parties argue the agreements are not ambiguous and can easily be construed to obtain the result each promotes, although each construction predictably requires a diametrically opposite result.

In *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 582, 738 P.2d 866 (1987), the Supreme Court restated the fundamental legal concepts to be applied when the rights of parties relative to the terms of a written agreement are in controversy:

" 'The doctrine has been well established and frequently applied that where parties have carried on negotiations, and have subsequently entered into an agreement in writing with respect to the subject matter covered by such negotiations, the written agreement constitutes the contract between them and determines their rights. [Citations omitted.] The interpretation of a written contract which is free from ambiguity is a judicial function and does not require oral testimony to determine its meaning. [Citations omitted.] Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning. [Citation omitted.] If a written contract is actually ambiguous concerning a specific matter in the agreement, facts and circumstances existing prior to and contemporaneously with its execution are competent to clarify the intent and purpose of the contract in that regard but not for the purpose of varying and nullifying its clear and positive provisions.' *Hall v. Mullen*, 234 Kan. 1031, 1037, 678 P.2d 169 (1984)."

"Whether an ambiguity exists in a written instrument is a question of law to be decided by the court." *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988). If the contract is ambiguous, the court can consider ex-

trinsic evidence to determine its meaning. *Wood River Pipeline Co.,* 241 Kan. at 582. This court on appeal may construe and determine the legal effect of the saltwater disposal agreement. See *Kennedy & Mitchell, Inc.,* 243 Kan. at 133.

Several rules of construction are relevant to this situation:

"First, words cannot be written into the agreement imparting an intent wholly unexpressed when it was executed. *Quenzer v. Quenzer,* 225 Kan. 83, 85, 587 P.2d 880 (1978). The intent of the parties and the meaning of a contract are to be determined from the plain, general, and common meaning of terms used. *Johnson v. Johnson,* 7 Kan. App. 2d 538, 542, 645 P.2d 911, *rev. denied* 231 Kan. 800 (1982). Second, in construing a written instrument, language used anywhere in the instrument should be considered and construed in harmony with all provisions and not in isolation. *Kennedy v. Classic Designs, Inc.,* 239 Kan. 540, 722 P.2d 504 (1986)." *Wood River Pipeline Co.,* 241 Kan. at 586.

We do not agree with the trial court's statement that the same rule would apply to the construction of the saltwater disposal agreement as to the construction of an oil and gas lease (strictly against the lessee), citing *Holmes v. Kewanee Oil Co.,* 233 Kan. 544, 552, 664 P.2d 1335 (1983), or its application of the general rule that "doubtful language in a contract is construed most strongly against the party preparing the instrument or employing the words concerning which doubt arises." *Wood River Pipeline Co.,* 241 Kan. at 586. A careful review of the record reveals both parties participated equally in drafting and negotiating the final written saltwater disposal agreement. "The general rule that doubtful language in a contract is construed against the drafter is of little consequence where the parties are of equal bargaining power and have each had an opportunity to fully examine proposed contract provisions before the contract is executed." 241 Kan. 580, Syl. ¶ 6. The rule which must be applied here is that "[w]here an ambiguous contract is prepared jointly and equally by the parties, it will not be liberally or strictly construed against either party." *Crestview Bowl, Inc. v. Womer Constr. Co.,* 225 Kan. 335, Syl. ¶ 4, 592 P.2d 74 (1979).

The rental provision of the disposal well agreement does not distinguish between payment for on-premises and off-premises water, and specifically provides that "RUPE shall pay to COLBURNS the amount of One and One-half Cents (1½¢) per barrel of liquid disposed into the subject disposal well." This provision

examined alone would clearly justify a holding that Rupe contracted away his right for free disposal of on-premises water in favor of greatly expanded rights and the opportunity for economic advantage by receipt of substantial payments for disposal of off-premises water on the Colburns' property. We are required, however, to consider language used throughout the agreement and not limit our review to an isolated provision, no matter how persuasive it may be.

Paragraph four of the saltwater disposal agreement dealing with priority is phrased in terms of maximizing income to the Colburns, but does not indicate whether such maximization applies to income from saltwater disposal or from the oil and gas lease. If the Colburns receive payment for disposal of on-premises water, their income will be maximized under the saltwater disposal agreement, but testimony showed that the economic life of the Colburns' wells would be shortened, resulting in decreased royalty income. This makes the phrase "maximize the income payable to COLBURNS" capable of different constructions and, therefore, ambiguous; however, this difference is not ultimately critical to the decision in this case.

The subordination clause in the saltwater disposal agreement is also capable of different constructions. The Colburns contend the intent of the subordination clause was to prevent interference by the operation of the disposal well with the production of oil and gas under the lease, while Parker asserts the clause was inserted to assure Rupe would not lose any express or implied rights granted by the oil and gas lease, specifically the implied right to dispose of on-premises salt water at no cost.

The subordination clause could be considered subject to the well-settled rule set forth in *Smith v. Russ*, 184 Kan. 773, 339 P.2d 286 (1959), that when there is an uncertainty in a contract between general terms and specific provisions, the specific provisions qualify the meaning of the general provisions. "[S]pecific provisions express more exactly what parties intend than broad or general clauses which do not necessarily indicate that the parties had the particular matter in thought." 184 Kan. at 779. Paragraph two specifically provides the Colburns are to be paid one and one-half cents per barrel for all liquid disposed of into the well and would control over the general provisions contained in the subordination clause.

Paragraph two further provides that the Colburns have the right to cancel the saltwater disposal agreement if the well does not gen-

erate income of $1,000 per year. Under this provision, if the only water being disposed of in the well is from the Colburns' lease and they receive no payment for the water, they would presumably have the right to cancel the saltwater disposal agreement.

When considered as a whole, we agree with the trial court that the saltwater disposal agreement contains ambiguities requiring evidence of intent concerning the manner of payment.

The evidence of intent produced at trial was conflicting. The Colburns' testimony and that of their lawyer was clear and specific that they were to be paid for all salt water disposed of in the well. George Colburn did admit that he did not intend the saltwater disposal agreement to take away any rights arising under the oil and gas lease, but he was unaware that a lessee-operator had the right to dispose of salt water without paying the lessor a fee and, in fact, he thought he had the right to negotiate with any third party for a similar agreement.

Rupe testified that his intent at the time the saltwater disposal agreement was negotiated was to pay the Colburns only for off-premises salt water disposed of in the well. Rupe's accountant and attorney offered similar testimony.

All the parties agreed this direct issue was not discussed during the preliminary stages of the negotiations or during the meeting in which the saltwater disposal agreement was finalized.

The trial court made no factual determination based on the contention of either party concerning the early offer of 10% of income from "all outside water" and the "One and One- half Cents ($1\frac{1}{2}$¢) per barrel of liquid disposed into the subject disposal well" from the agreement. In the absence of these arguments resulting in a specific factual finding by the trial court, we believe both arguments to be inconclusive and of no benefit to either party on appeal.

We believe the evidence that Damson paid one- and one-half cents per barrel for disposal of on-premises water during the first year the disposal well was in operation is of considerable importance. This is a factual matter indicating a construction placed on the agreement by the parties, which is greatly persuasive. Further, Parker's senior lease operator and operations foreman Allen Humphreys' opinion that, despite industry custom, Parker would be obligated to pay for disposal of on-premises water as well as off-premises water supports the trial court's finding.

Several expert witnesses who testified at trial on behalf of Parker clearly stated that the custom and practice in the oil industry would not require payment by a lessee-operator for on-premises saltwater disposal. Because of the trial court's finding that the agreement is ambiguous, this testimony was properly considered. See *Havens v. Safeway Stores,* 235 Kan. 226, Syl. ¶ 1, 678 P.2d 625 (1984). Saltwater disposal agreements previously utilized on other leases by two of the experts, however, specifically provided that the lessee would be entitled to dispose of salt water produced from any wells on the leased premises at no cost. The experts' testimony and their exhibits, although produced by Parker, can logically be deemed compelling to the Colburns' position.

Even Rupe's attorney admitted that a saltwater disposal agreement should spell out that payment was only for off-premises water and that such a provision would be set forth in the usual agreement.

Based upon the evidence of intent introduced at trial, the trial court determined the Colburns were to be paid for all salt water, both on-premises and off-premises, disposed of in the well. When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, this court's

"power begins and ends with the determination whether there is any competent substantial evidence to support them, and where findings are so supported they are accepted as true and will not be disturbed on appeal, and in such case it is of no consequence that there may have been much contradictory evidence adduced at the trial which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment. [Citations omitted.]" *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 168, 354 P.2d 326 (1960).

See *Holmes v. Kewanee Oil Co.,* 233 Kan. at 546.

In *Crestview Bowl, Inc. v. Womer Constr. Co.,* 225 Kan. at 340-41, Justice McFarland opined:

"In construing an ambiguous contract, a reasonable interpretation is sought. On this rule of construction, we held in *Tate v. Stanolind Oil and Gas Co.,* 172 Kan. 351, 356, 240 P.2d 465 (1952), as follows:

'Reasonable rather than unreasonable interpretations are favored by the law. (*Brooks v. Mull,* 147 Kan. 740, 747, 78 P.2d 879.) The meaning of a contract should never be determined by a critical analysis of a single or isolated provision but should always be ascertained by a consideration of all pertinent provisions. (*Heckard v. Park,* 164 Kan. 216, 219, 188 P.2d 926, 175 A.L.R. 605, 617.) Where ambiguity or uncertainty is involved the in-

tention of the parties is not ascertained by resort to a literal interpretation of an isolated provision but by a consideration of the instrument as a whole, the object sought to be obtained and other circumstances, if any, which tend to clarify the real purpose and intent of the parties. (*Heckard v. Park,* supra.) A practical and equitable construction of ambiguous terms of a contract should be adopted. (*Berg v. Scully,* 120 Kan. 637, 245 Pac. 119; *Francis v. Shawnee Mission Rural High School,* 161 Kan. 634, 640, 170 P.2d 807.)' "

It is not our role to pass on the credibility of witnesses or weigh conflicting evidence. *Rosenbaum v. Texas Energies, Inc.,* 241 Kan. 295, 301, 736 P.2d 888 (1987); *Cool v. Cool,* 203 Kan. 749, 752, 457 P.2d 60 (1969).

Substantial competent evidence supports the trial court's determination of the parties' intent. Based upon our scope of review, the trial court did not err in its construction of the saltwater disposal lease. Although the lessee under an oil and gas lease has the implied right to dispose of salt water on the leased premises without payment to the lessor, that right may be bargained away by agreement between the parties.

*Did the trial court err by construing the saltwater disposal agreement in such a manner so as to defeat the intent of one party to the agreement?*

Everything we have stated regarding the preceding issue applies to this argument as well. Parker contends Rupe's intention was clearly disregarded and the trial court made a contract for the parties instead of enforcing the existing one; it also raises for the first time on appeal that there was no meeting of the minds when the parties entered into the lease.

As we have previously held, the trial court did not err in its construction of the saltwater disposal agreement. "Interpreting a written contract is a judicial function." *Kauk v. First Nat'l Bank of Hoxie,* 5 Kan. App. 2d 83, 87, 613 P.2d 670 (1980). As the trier of facts in this case, the trial court was required to construe the intent of the parties. *Snodgrass v. State Farm Mut. Auto. Ins. Co.,* 15 Kan. App. 2d 153, 157, 804 P.2d 1012, *rev. denied* 248 Kan. 997 (1991). No matter in whose favor the trial court ruled regarding the issue of intent, the alleged intent of one party to the lease would have been defeated.

The trial court did not improperly make a contract for the parties or rewrite the lease. See *Quenzer v. Quenzer,* 225 Kan.

83, 85, 587 P.2d 880 (1978). The trial court properly construed the ambiguous agreements and made a realistic and justified legal interpretation.

Parker's suggestion that there was no meeting of the minds was not raised or considered until a post-trial statement was made by the trial court. It was not one of the issues specifically tried in the case and will not be considered by us for the first time on appeal. See *Kansas Dept. of Revenue v. Coca Cola Co.,* 240 Kan. 548, 552, 731 P.2d 273 (1987).

Affirmed.