# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2234

CEDAR FARM, HARRISON COUNTY, INC.,

*Plaintiff-Appellant*,

*v.*

LOUISVILLE GAS AND ELECTRIC COMPANY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 07 C 1230—**David F. Hamilton**, *Judge*.

ARGUED MAY 9, 2011— DECIDED SEPTEMBER 29, 2011

Before EASTERBROOK, *Chief Judge,* and WOOD and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. This case involves an attempt by the landowner Cedar Farm to expel the Louisville Gas and Electric Company from its property and terminate an oil and gas lease for violations of certain portions of the lease. Because we find that the lease allows for a damages remedy, and that Cedar Farm has not shown that damages are inadequate to compensate for the harm to its property, we affirm

the district court's grant of summary judgment to Louisville Gas and Electric on Cedar Farm's ejectment claim.

## I. BACKGROUND

Cedar Farm owns 2,485 acres of land, approximately four square miles, along the Ohio River in southern Indiana. On the property is Indiana's only antebellum plantation complex, which includes Withers' Mansion, an 1837 classical-revival structure. The plantation complex is currently on the National Register of Historic Places. Approximately 2,000 acres of the property have been designated as a "classified forest" by the Indiana Department of Natural Resources, and these lands include habitats for rare and endangered wildlife species. Cedar Farm has a number of public uses: the property is enjoyed by members of the general public, used by the Girl Scouts of Kentuckiana, and utilized for research by the Nature Conservancy and Cornell University.

Louisville Gas and Electric Company ("LG&E") is a regulated gas and electric utility company serving customers in Kentucky. Starting in 1947, LG&E secured multiple leases in its favor for storing and extracting oil and natural gas on certain portions of the current property. By June 1996, Cedar Farm had acquired all of the parcels of the property, and the parties then negotiated to consolidate the multiple leases into the Amended and Consolidated Oil, Gas and Gas Storage Lease (the "Lease"). The Lease encumbers approximately 2,176 acres of the property.

The Lease, by its express terms, continues in effect so long as "oil or gas is produced in paying quantities" or "the Property continues to be used for the underground storage of gas." The Lease also contemplates two other events giving rise to termination: (1) the cancellation provision, which affords LG&E (but not Cedar Farm) the right to "surrender" the Lease "at any time upon payment of one ($1.00) dollar . . . ;" and (2) the payments clause, which says that the failure of LG&E to make required payments under the Lease is not a basis for invalidating its rights unless payment is still not forthcoming 30 days after written demand by Cedar Farm.

The Lease contains a specific provision requiring LG&E to "pay for damages caused by its operations," and contains a specific formula for calculating monetary damages for harm to the trees on Cedar Farm's property. It contains a number of other provisions intended to preserve the integrity of the historic sites and forest habitats. Specifically, the Lease authorizes LG&E to use the property only "as may be minimally necessary . . . in connection with its production or storage operations." LG&E is obliged to give Cedar Farm prior notice of any activity on the Property and to cooperate with Cedar Farm so as not to interfere unreasonably with Cedar Farm's use of the Property. And LG&E must "use its best efforts to do all . . . activities related to its operations in a workmanlike manner."

Cedar Farm claims that LG&E has repeatedly breached the Lease. Cedar Farm alleged that LG&E: (a) used

out-of-state maintenance crews to "hack down trees needlessly and indiscriminately"; (b) removed tree limbs in several areas, including classified-forest areas, without proper notice to Cedar Farm; (c) installed pump jacks (large, above-ground pumping units also known as "nodding donkeys") on elevated platforms in the middle of a scenic vista overlooking the Ohio River known as "Pinnacle Point" and painted them bright yellow; (d) has tossed concrete rubbish into the brush adjacent to the pump jacks and dumped (or allowed others to dump) construction and scrap materials on the property; (e) allowed ruts and other impediments to render some road areas on the property nearly impassable; and (f) installed (or allowed others to install) storage tanks that appear to be leaking unidentified fluids. Cedar Farm also alleges that after the lawsuit was filed, LG&E mowed down chestnut saplings provided by the American Chestnut Society, and it locked the gate in late December 2008, preventing the owners from accessing the Property during the holiday season.

Cedar Farm filed suit in state court, which was removed to the Southern District of Indiana. Count one of Cedar Farm's amended complaint sought damages, and count two sought to evict LG&E from the property and to terminate the lease. After discovery, LG&E moved for partial summary judgment on the second count, arguing that the lease did not contemplate ejectment for the misconduct alleged by Cedar Farm, only damages. Cedar Farm argued that the lack of a clause regarding termination for such conduct did not bar its ejectment action.

The district court granted LG&E's motion for partial summary judgment, finding that a disagreement about the use of land was not an expressly provided for rationale for termination, and that the lease specifically provided that damages were the proper remedy for such a disagreement. The court rejected Cedar Farm's arguments that silence as to termination for non-compliance with the provisions at issue allowed termination as an available remedy. The court also found that Cedar Farm failed to show that damages were an insufficient remedy.

LG&E then moved for summary judgment on the damages claim. Rather than litigate its damages claim, Cedar Farm filed a motion to dismiss count one voluntarily, without prejudice. LG&E objected and argued that dismissal should occur with prejudice or with certain conditions, including Cedar Farm's reimbursement of LG&E's attorneys' fees and costs incurred in moving for summary judgment and an order requiring that any future lawsuit arising from the same circumstances be filed in federal district court. The district court gave Cedar Farm the choice of those two options. *Cedar Farm, Harrison Cnty., Inc. v. Louisville Gas and Elec. Co.*, 2010 WL 1268051, at *2 (S.D. Ind., March 26, 2010). Cedar Farm elected to dismiss the damages claim with prejudice so it could go forward with an appeal of the ejectment claim. The district court entered final judgment, and Cedar Farm now appeals the grant of summary judgment to LG&E on the ejectment claim.

## II. ANALYSIS

We review a district court's order granting summary judgment de novo. *Walker v. Sheahan*, 526 F.3d 973, 976 (7th Cir. 2008). We construe all facts and reasonable inferences in favor of the non-moving party. *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 704 (7th Cir. 2009). Summary judgment is appropriate where the pleadings, discovery, disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 563 (7th Cir. 2009).

Cedar Farm argues that the district court essentially decided this issue as a matter of law based on the pleadings, and that we should treat this case as a 12(b)(6) motion, finding that the *allegations* are sufficient for the case to proceed to the trier of fact. This is a misreading of the district court's opinion. The district court specifically found that "[t]o avoid summary judgment on the remedy of termination, Cedar Farm needed to come forward with evidence that would allow a reasonable trier of fact to conclude that damages would not compensate it adequately for the harm to its property. . . . It has not done so." This is a determination that, even viewed in the light most favorable to Cedar Farm, the record did not show a genuine issue of material fact. Cedar Farm does not suggest that it was denied the opportunity to provide additional evidence regarding the adequacy of damages (which it was seeking

in count one of the amended complaint and had not yet sought dismissal on); rather, it rests on its allegations. Despite Cedar Farm's reliance on the allegations in the amended complaint, we decline to view the proceedings as a 12(b)(6) motion.

The only question before us is whether termination is permitted based on the damage to the property caused by LG&E. Under Indiana law, courts will generally enforce forfeiture or termination clauses in oil and gas leases before the lessee has begun drilling. *Risch v. Burch*, 95 N.E. 123, 126 (Ind. 1911). This ensures that the lessor, in the event the lessee does not drill or seek to extract the resources profitably, can enter into a new contract and avoid losing the economic value of the resources below. But once the lessee begins to produce oil or gas, it acquires an interest in the land. *Rembarger v. Losch*, 118 N.E. 831, 833 (Ind. App. 1918) ("[I]f such exploration and development is made in accordance with the terms of such lease, and oil or gas are produced thereby as therein provided, such lessee acquires an interest in such land."). As the district court noted, and as the parties agree, courts are reluctant to enforce even explicit forfeiture provisions if damages can adequately compensate the lessor. *Barrett v. Dorr*, 212 N.E.2d 29, 35 (Ind. App. 1965); *Rembarger*, 118 N.E. at 833.

In *Rembarger*, the lessor of an oil and gas lease sought cancellation of the lease based on the lessee's alleged noncompliance with the agreement. After a bench trial, the trial court found that there was sufficient

evidence of breaches of the agreement for which termination was contemplated in the lease. *Rembarger,* 118 N.E. at 832. The Appellate Court of Indiana reversed, finding that even though the termination was based on "certain specific violations" of the lease, the lessor failed to show that money damages were inadequate to compensate for losses. *Id.* at 833. The court found that "it is well settled that to entitle a lessor of mining property to equitable relief by way of forfeiture or cancellation of a lease . . . it must appear that there is not an adequate remedy at law by suit for damages." *Id.* at 833-34. Notably, the court found that "[t]he burden is upon the plaintiff to establish an absence of such remedy, when relief in equity is sought." *Id.* at 834.

Cedar Farm relies primarily on *Thurner v. Kaufman*, 699 P.2d 435, 438-41 (Kan. 1984), a Kansas Supreme Court case which affirmed termination of an oil and gas lease after production had commenced. In *Thurner*, the lease did not contain an express termination provision, but the court found that the lessee had "flagrantly violated" restrictions on its use of the surface "as to deny the lessors the use of the surface rights retained." *Id.* at 439. In that case, the lessee: (a) allowed salt water to be drained onto the land, (b) left gates open allowing livestock to escape, (c) allowed oil to spill which covered livestock and affected livestock breeding, and (d) allowed oil to drain into a pond. The court in *Thurner* found that the violations denied "the lessors the right to pursue farming operations which are the lessors' means of livelihood." *Id*.

The district court considered the effect of *Thurner* on this case, and assumed that "Indiana courts might follow *Thurner* on similarly extreme facts," but found that "the breaches alleged by Cedar Farm are not so comparable as to justify the extreme remedy of implying a right of forfeiture of this producing oil and gas lease." We agree. While LG&E's damage to this unique and historic property is certainly not trivial, the Lease contemplates money damages as the proper remedy. And to overcome the express terms of the Lease and eject LG&E from the property, Cedar Farm cannot rely on the mere existence of harm as alleged in its complaint and the statements in its filings that LG&E "treats all injuries as remediable simply by writing a check—which is not the case with this historically, architecturally, and environmentally significant Property." We do not doubt that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). But to survive summary judgment in this case and under this Lease, Cedar Farm needed to provide specific evidence in order to show a trier of fact the environmental impact of LG&E's actions and *why* writing a check would be insufficient. *See* Fed. R. Civ. P. 56(c)(4), (d)-(e); *see also, Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 707 (7th Cir. 2011) (" . . . to survive summary judgment . . . Omnicare must show that it has *produced evidence* that, when considered collectively, would permit a reasonable jury to conclude that United and PacifiCare agreed to work together to fix prices.") (emphasis added); *Clifford*

*v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 271 (7th Cir. 2010) (finding that to survive summary judgment, farmer needed to *produce evidence* permitting reasonable trier of fact to find all of elements of claim). Did the specific trees that were cut down serve as the habitat for specific endangered species? Did the "unidentified" fluids have an identity and damage irreplaceable structures or prevent users from carrying out their enjoyment of the property? An affidavit or other form of proof along these lines was necessary, and Cedar Farm did not submit, and does not argue it was prevented from submitting, such evidence to the district court.

Cedar Farm alternatively seeks certification to the Indiana Supreme Court on the question of "whether Indiana would allow a lessor to terminate an oil-and-gas lease where recurring breaches of the lease threaten to inflict intangible, irreparable harm on the subject property." In applying our Circuit Rule 52,[1]

---

[1] Circuit Rule 52 reads in relevant part:

(a) When the rules of the highest court of state provide for certification to that court by a federal court of questions arising under the laws of that state which will control the outcome of a case pending in the federal court, this court, sua sponte or on motion of a party, may certify such a question to the state court in accordance with the rules of that court, and may stay the case in this court to await the state court's decision of the question certified. The certification will

(continued...)

we have found that "[t]he most important consideration guiding the exercise of this discretion . . . is whether the reviewing court finds itself genuinely uncertain about a question of state law that is vital to a correct disposition of the case." *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 672 (7th Cir. 2001) (quoting *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C. Cir. 1988)). We have further held that "certification is appropriate when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue." *In re Badger Lines, Inc.*, 140 F.3d 691, 698-99 (7th Cir. 1998). We are careful not to "overburden state courts with requests for certification when what is required is not the promulgation of new law but rather, the exercise of a court's judgment." *State Farm*, 275 F.3d at 672. "[F]act specific, particularized decisions that lack broad, general significance are not suitable for certification to a state's highest court." *Woodbridge Place Apartments v. Washington Square Capital*, 965 F.2d 1429, 1434 (7th Cir. 1992).

The Indiana Supreme Court rule authorizing certified questions from federal courts imposes two requirements:

---

[1] (...continued)
be made after the briefs are filed in this court. A motion for certification shall be included in the moving party's brief.

the state-law issue must be "determinative" of the case and not governed by "clear controlling" state-law precedent: "[A]ny federal circuit court of appeals . . . may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Ind. App. Rule 64(A).

As we have said above, the parties agree that under Indiana law forfeiture is a disfavored remedy unless the lessor makes a showing that money damages are inadequate. Cedar Farm cannot show that there is a conflict between state intermediate courts of appeal, or that we face an issue of first impression in Indiana. *See State Farm*, 275 F.3d at 672 (citations omitted). Cedar Farm seeks to certify the question of whether the *type* of recurring damage alleged would suffice, which we find is not an appropriate question for certification. Not only is this a question that relates to specific facts and is an exercise of the court's judgment, but Cedar Farm fails to acknowledge that it was an evidentiary failure that led to the district court granting summary judgment to LG&E, and this would not be resolved by certification. We therefore decline Cedar Farm's request for certification.

Cedar Farm argues that absent a finding that termination is warranted here, LG&E will repeatedly and materially violate the lease, and Cedar Farm's only remedy will be to sue (again and again) for damages. For the sake of the property, we hope that is not the

case. But those are the terms of the Lease, and because there was no showing that money damages would be inadequate, we affirm the grant of summary judgment on the ejectment claim.

### III. CONCLUSION

For the reasons set forth above, the grant of summary judgment in favor of LG&E is AFFIRMED.