No. 87,624

STEVE CRAWFORD, d/b/a S & M OIL COMPANY, *Appellee*, v. MARVIN HRABE, BRUCE KROB, LUCILLE ROGERS, and PATRICIA IREY, *Appellants*.

(44 P.3d 442)

Opinion filed April 19, 2002.

*Terry L. Cikanek*, of Cikanek Law Office, of Stockton, argued the cause and was on the brief for appellants.

*Ross J. Wichman*, of Anderson & Wichman, of Hays, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This appeal raises the conflict between a lessor (Marvin Hrabe, *et al*, herein called Hrabe or lessor) and a lessee (Steve Crawford, d/b/a S & M Oil Co., herein called Crawford, lessee, or operator) over whether the implied covenants and rights under an oil and gas lease executed in 1962 between the present parties' predecessors in interest allow the lessee to bring off-lease water on the leased premises to be used for injection purposes in a Kansas Corporation Commission (KCC) approved secondary recovery project without the lessor's consent or agreement.

## Background of the case

The oil and gas lease in issue is a Form 88 (Producers) 1-48 B+, which grants usage of Hrabe's land "for the sole and only purpose of mining and operating for oil and gas, and laying pipe lines, and building tanks, power stations and structures thereon to produce,

save and take care of said products." An additional granting clause gives the lessee "the right to use, free of cost, gas, oil, and water produced on said land for its operation thereon, except water from wells of lessor."

The history of operations on the property disclose a disposal agreement permitting the lessee to dispose of salt water from off-lease property, a pipeline right of way, complaints concerning salt water related to faulty operations, and the plugging and abandonment of the salt water disposal well in 1988.

The present controversy appears to have its beginnings in the spring and early summer of 1996. Crawford began injecting water from other leases he operated into one of the Hrabe wells. Crawford filed an application with the KCC to inject salt water from the Hrabe "B" lease, the Hrabe "C" lease, and the Baxa lease into the G-2 well on the Hrabe property. A hearing was held on this application on April 18, 1996, with Hrabe protesting the application, contending the only benefit would be to the Baxa lease and that pollution could be caused by poorly plugged wells.

The KCC order dated June 5, 1996, but not mailed until June 10, 1996, found (1) permitting the injection would prevent waste and likely allow additional oil to be recovered from the Hrabe lease, (2) correlative rights would not be violated, and (3) usable water would be protected. The order acknowledged it could not be certain which direction the water flood would drive the oil but it was more likely the oil would be driven to the higher structure G-1 and C-1 wells on the Hrabe property.

The KCC conditioned its order by requiring Crawford to pay fines levied for injecting water without a permit and in a later writing stated the issue of the right to use off-lease water in the Hrabe G-2 well was a "civil matter between the operator and mineral/or surface owner which is outside the jurisdiction of the Commission."

On June 7, 1996, Hrabe stopped the off-site water from coming on his land by severing the pipeline running to the Hrabe G-2 well. Shortly thereafter, Crawford commenced this action by asking for a temporary restraining order to prevent Hrabe from damaging

pipelines used to transport and inject salt water into the Hrabe G-2 well. The trial court initially denied the request.

In response to Hrabe's summary judgment motion, the court found that Crawford did not have a right to dispose of salt water by injecting it in the G-2 well, either in law, under the lease, or by the right of way agreement. Hrabe asked for the trial court's decision to be clarified to hold that Crawford could not bring off-lease salt water onto his property for any purpose, whether for disposal, or secondary recovery purposes. Additional briefs were requested and the parties entered into the following stipulation of facts:

1. Crawford has the authority from the KCC to operate a secondary recovery operation on the Hrabe lease.

2. Crawford's secondary recovery operation consists of the injection of Kansas City sourced brine, from off Hrabe lease sources, into the Kansas City oil producing formation in the Hrabe lease wells.

3. Crawford's secondary recovery operations on the Hrabe lease have increased the production of oil from the Hrabe lease wells.

4. The increased oil production is economically beneficial to interested parties.

5. The KCC approved Crawford's utilization of off-lease brine for secondary recovery operations on the Hrabe lease, but the KCC's position is that whether the water can be brought in is a civil matter between the landlord and the tenant.

6. The oil and gas lease in this case gives the tenant the right to use, free of charge, water produced on the premises for its operations.

7. A geologist has stated that the Hrabe lease oil wells produce insufficient salt water with which to adequately complete and continue ongoing secondary recovery operations by means of salt water injection.

8. Crawford produced salt water from other oil wells in the area (not on the Hrabe lease) sufficient to complete and continue sec-

ondary recovery operations by means of salt water injection on the Hrabe lease wells.

9. If Crawford did not have the off-lease brine available from off-lease sources, and if he was to continue utilization of secondary recovery operations by means of salt water injections into the Hrabe lease wells, he would have to drill a supply well to obtain water.

10. That supply well would produce Dakota water.

11. It is more economical for Crawford to use off-lease Kansas City brine in the Kansas City formation on the Hrabe lease wells than to undertake the cost to drill and maintain a supply well or to convert an abandoned hole on the Hrabe lease as a supply well.

12. A number of operators in the area pay the landowner to bring off-lease water onto the landowner's property for injection purposes.

13. A number of operators in the area bring off-lease brine onto the premises under the assumption that they have an implied right to do so as a prudent operator.

14. Not all operators utilize secondary recovery operations.

15. A geologist's testimony would indicate that a prudent operator would use secondary recovery operations to improve production from the Hrabe lease.

16. Dakota water, or water from any source, would serve the same purposes as off-lease Kansas City water injected into the Hrabe lease's Kansas City formations.

17. A geologist would testify that for production purposes it is more beneficial that Kansas City formation generated water be injected into Kansas City oil producing formation.

*Trial Court's Ruling*

The decision of the trial court confirmed that Hrabe concedes Crawford's right to engage in secondary recovery operations but that Hrabe contended the lease itself prohibits the usage of off-lease water. The trial court's decision discounted the lessor's ar-

gument that the standard clause in the Producer's Form 88 lease which states: "Lessee shall have the right to use, free of cost, gas, oil, and water produced on said land for its operations thereon, except for water from wells of lessor," constituted a limitation on water usage to on-site water. The court held this provision is a grant of a right and not a restriction. In that the lease language does not prohibit or permit usage of off-lease water, the trial court held the lease offered little guidance.

The trial court concluded there was nothing in the lease or in the law implying that the right to engage in secondary recovery is limited to injection of water obtained on the lease. The trial court pointed out that the parties had stipulated that production increased from the use of off-lease water injection and to drill a supply well on the property would not be as economical or reasonable as using the off-lease water, and from this concluded that Crawford was not prohibited from using off-lease water in his secondary recovery operations. From this decision, Hrabe appeals.

### Standard of Review

Our standard of review is as set forth in *Heiman v. Parrish*, 262 Kan. 926, 927, 942 P.2d 631 (1997), where we said:

"Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions, and stipulations, the trial court had no peculiar opportunity to evaluate the credibility of witnesses. In such situations, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine de novo what the facts establish. *Kneller v. Federal Land Bank of Wichita*, 247 Kan. 399, 400, 799 P.2d 485 (1990). This court's review of conclusions of law is unlimited. *Gillespie v. Seymour*, 250 Kan. 123, 129, 823 P.2d 782 (1991)."

### Analysis

The limited issue presented to us is whether a lessee/oil operator has the right without the lessor/landowner's consent to bring off-lease salt water upon the leased premises for purpose of injecting it into the producing formation in a secondary recovery project.

Although some of the authority we quote relates to an operator's usage of the leased property in its production operations, both par-

ties to this appeal are in agreement that Crawford has the right to conduct secondary recovery operations under the oil and gas lease.

Several courts and treatises have alluded to a potential *duty* upon the operator and lessee to engage in secondary recovery. See Williams, *Problems in the Conservation of Gas*, Second Annual Rocky Mountain Mineral Law Institute, 295, 338 (1956) (quoting Merrill, *Implied Covenants and Secondary Recovery*, 4 Okla. L. Rev. 177, 181 [1951], which states that "since [secondary recovery methods] afford a means of increasing the return to the lessor from oil which would be left in the ground if operations were confined to primary methods, they constitute a part of the general duty of diligent operation of the premises"); 5 Williams and Meyers, Oil and Gas Law § 861.3, p. 429 (1997) (noting that there is "limited authority" that an oil and gas lessee may be subject to a duty to institute secondary recovery, but also suggesting such litigation would be rare due to the high burden of proof on the lessor to show the operations would be profitable); *Ramsey v. Carter Oil Co.*, 74 F. Supp. 481, 482 (E.D. Ill. 1947) ("[I]t would seem that a reasonably prudent operator . . . has the right implied in an oil lease to adopt proper gas repressurizing systems for secondary recovery. . . . Indeed, it would seem that he is under the same duty to do so as he is to drill offset wells."); *Utilities Production Corporation v. Carter Oil Co.*, 72 F.2d 655, 659 (10th Cir. 1934) (while discussing the use of injected gas for secondary recovery, the court stated: "In fact, the lessor would doubtless have just cause to complain if an inefficient operation of the leases resulted from the failure of the lessees to use improved methods which came in common use during the terms of the leases."). We have not recognized such a duty to this date in Kansas and point out that Hrabe has argued that he would rather have the wells on his property plugged and the oil and gas lease abandoned than subject his property to the unwanted and claimed illegal water from beyond his property's boundaries.

Hrabe looks to the water being injected as placing a burden on his property which improperly benefits Crawford, who is also the operator of the two adjacent leases from which the water is obtained. He points to the language of the oil and gas lease which states that allowing water from his premises to be used as meaning

the converse that off-lease water may not be used. He contends the trial court has improperly modified the lease to impose a burden which the original lessors and their successors never intended.

Hrabe asks that the wording of the lease be construed against the lessee preparer, citing *Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 552, 664 P.2d 1335 (1983). He suggests the trial court expanded the effect of the KCC order beyond its intended purpose.

While Hrabe admits that an operator does not need a landowner's permission to dispose of salt water produced on the landowner's land, *Colburn v. Parker & Parsley Dev. Co.*, 17 Kan. App. 2d 638, Syl. ¶¶ 1, 2, 842 P.2d 321 (1992), his basic position is that a different rule applies if the water comes from outside the leasehold property. In that scenario he argues the operator must have the landowner's permission to dispose of or inject off-lease water on a landowner's land even where the usage is for a KCC-approved secondary recovery project.

Finally, Hrabe argues the trial court's decision provides operators with an unfair economic benefit of obtaining money to dispose of water from a third party under the guise of injecting it for secondary recovery process. Even though an early increase in production might exist, Hrabe says affirming the trial court may impose an undue detriment on him when oil migrates to adjoining leases. This is why he contends that secondary recovery projects should be unitized either by an agreement or pursuant to unitization authority under the control of the KCC . If such were the case, Hrabe admits he would not question the trial court's decision.

Crawford argues, in accordance with the trial court's decision, that the oil and gas lease neither permits nor prohibits off-lease water to aid in secondary recovery, resulting in "little guidance on the issue." He points to the following quotes from *Colburn*:

" ' "If in the grant or reservation of a separate interest in oil and gas the grantor does not expressly grant or retain such legal relations as are necessary for the production and operation of the land for oil and gas purposes, these relations are held to be created by implication.' "

"See also *McLeod v. Cities Services Gas Company*, 131 F. Supp. 449 (D. Kan. 1955) (a mineral lessee may make reasonable use of leased land when carrying out legitimate object of the lease), *aff'd* 233 F.2d 242 (10th Cir. 1956); *Thurner v. Kaufman*, 237 Kan. 184, 188, 699 P.2d 435 (1985). ('Under an oil and gas lease,

the lessee has the implied right to make reasonable use of the surface in order to develop the land for the oil and gas.') 1 Pierce, Kansas Oil and Gas Handbook § 9.20, p. 9-18 (1986) ('The lessee is typically granted the right to use the leased land to conduct exploration, development, and production activities. If the lease does not expressly confer such rights, they will be implied.').

"Although Pierce recommends the right to dispose of substances through injection wells should be addressed in agreements separate from the oil and gas lease, he notes that, even without express grants, the oil and gas lessee has broad implied authority to use the lease land to conduct operations. 1 Pierce, Kansas Oil and Gas Handbook § 12.05, p. 12-8." 17 Kan. App. 2d at 644-45.

Crawford quotes from Williams and Meyers, Oil and Gas Law §§ 218.5, 218.7, 218.8 (1997), to suggest that necessary usage of the surface is accepted and salt water produced from a lease may clearly be used in secondary recovery, but none of the cited sections sets forth the recognized right to use off-lease water for secondary recovery operations.

What Crawford really relies on are the factual stipulations of increased production, economic benefit to all parties, insufficient salt water for secondary recovery operations from Hrabe'wells, availability of ready water source, and that drilling of an additional well on the premises would be less economical. Crawford contends the trial court's decision is grounded on good oil business practices and, having been blessed by the geologist, the KCC and the trial court should be affirmed on appeal.

The cases which have been decided by the courts of the oil producing states have discussed the ramification of subsurface migration of salt water or oil from one leasehold to another caused by secondary recovery operations, the implied right to dispose of salt water, and the effect of administrative agency control over secondary recovery projects, but amazingly little case law, treatise discussions, or law review writings bear precisely on the question we face.

We first discuss three cases upon which Hrabe relies but which we do not find to be precisely on point. In *Robinson v. Robbins Petroleum Corporation, Inc.*, 501 S.W.2d 865 (Tex. 1973), the owner of the surface estate in land which was subject to an oil and gas lease sued the unit operator and mineral interest owners for wrongfully taking salt water from a well on his land to repressure

the oil-bearing formation. The unit included substantial acreage not owned by the plaintiff.

The Texas Supreme Court held that although lessee-owners of mineral interest had an implied easement to use the surface, including water, to the extent reasonably necessary to develop and provide the minerals, lessees had no right to produce the salt water from owner's surface estate and drive it through a secondary recovery unit that included acreage outside the leased tract, notwithstanding that the Railroad Commission had entered orders approving recovery units. 501 S.W.2d at 868.

While this holding can be read to be one of limitation of salt water usage to the leased premises, it would more properly be construed to uphold the right of the surface and mineral owners of the off-lease water to have a cause of action against Crawford than for Hrabe to have the right to restrict usage of off-lease water from coming on his premises. The *Robinson* opinion suggests that a contrary result to its decision would obtain in Oklahoma under the holding of *Holt v. Southwest Antioch Sand Unit, Fifth Enlarged,* 292 P.2d 998 (Okla. 1955).

In *Gill v. McCollum,* 19 Ill. App. 3d 402, 311 N.E.2d 741 (1974), the Illinois Appellate Court found that under the oil and gas lease in question, which permitted injection of fluids for the purpose of recovery of oil and other hydrocarbons, the lessee did not have a right to dispose of salt water from other leases. The lease did not limit the potential source of salt water for injection, but the facts of the case clearly evidenced that the salt water disposal would not increase oil or gas production from the lessor's wells. In upholding the trial court's injunction against the lessee, the court noted:

"Since the primary purpose of an oil and gas lease is to obtain production the above provisions must be read with this purpose in mind. *The injection must have some relation to the primary purpose of obtaining production.* Since in this case there was none, the injunction was properly granted." (Emphasis added.) 19 Ill. App. 3d at 404.

Applying this logic to our present case (although the Illinois court was not faced with our facts), because Crawford's salt water injection is related to the primary purpose of obtaining additional oil production, it should be found permissible under the lease.

A contrary result was reached in *Farragut v. Massey*, 612 So. 2d 325, 328 (Miss. 1992), where the Mississippi Supreme Court reversed the trial court's finding that off-lease salt water could be injected absent a separate agreement consenting to the disposal. The lessee's purpose for injecting the salt water was two-fold: (1) it increased the proceeds received by the lessee (the lessee charged a disposal fee), and (2) it extended the useful life of the oil field, thus preventing waste. It is not clear from the opinion whether the salt water injections actually increased production from the lessor's property or whether they were merely a general benefit to the entire oil field.

The *Farragut* court first turned to the relevant language of the agreement: "[Lessee may] establish and utilize [salt water disposal facilities] necessary or useful *in lessee's operations in . . . producing . . . minerals . . . from the land covered hereby or any other land adjacent thereto*." 612 So. 2d at 328. The court noted that this language permits the lessee to dispose of salt water it produces from the lessor's property as well as other properties the lessee operates, but it does not grant authority to dispose of salt water from third parties. We note this relates to the disposing of salt water and not a successful secondary recovery project. Also, Crawford is the operator of the properties from which the salt water is being utilized in our case.

The *Farragut* opinion appears to change the language of *Gill v. McCollum* when it states:

"Guided by this principle, an Illinois Court in *Gill v. McCollum* . . . found that the holder of a mineral lease does not have the right to *import* [the *Gill* court actually held there was no right to *dispose*] salt water from adjacent lands absent an express grant of authority. Professor Kuntz recognizes the same rule:
'The right of the mineral owner to use and occupy the land is restricted to operations for exploring for and extracting minerals from that land. Thus, the land cannot be used . . . to dispose of salt water from other land.' 1 E. Kuntz, A Treatise on the Law of Oil and Gas, § 3.2 at 87-88 (1987). Citing *Gill*, Kuntz notes that '[the] grant of the right to inject liquids and gas does not give the lessee the right to use a well on the leased premises for the disposal of salt water from other leases.' 4 E. Kuntz, § 50.4(c) (Supp. 1989)." 612 So. 2d at 328.

This decision is in fact a disposal situation and not one where beneficial results are being obtained in a secondary recovery pro-

ject. We do not believe that either *Robinson, Gill,* or *Farragut* support Hrabe's arguments other than incidentally.

Although somewhat factually different, in *Cassinos v. Union Oil Co.,* 14 Cal. App. 4th 1770, 18 Cal Rptr. 2d 574 (1993), the operator of an oil and gas lease, with permission of the surface owner but lacking permission of the lessor and owner of the mineral interest, injected off-lease salt water into the lease premises. The injections were for the benefit of outside leases, and the injections damaged the productivity of other wells on the leased premises. The trial court granted an injunction against the lessee and awarded damages in the amount of $1.75 per barrel of salt water injected. The lessee/operator appealed the court's finding that it committed trespass by interfering with the mineral owner's estate.

The California court first noted the standard for civil trespass in the context of a lessor/lessee relationship: "Where one has permission to use land for a particular purpose and proceeds to abuse the privilege, or commits any act hostile to the interests of the lessor, he becomes a trespasser." 14 Cal. App. 4th at 1780. The appellate court upheld the decision at trial: "[The lessee's] injection of offsite wastewater 'to maintain production of oil on leases other than the [lessor's] lease' exceeded the scope of consent under the lease." 14 Cal. App. 4th at 1781. Applying this logic to our present case would again lead to the conclusion that if off-site water is injected for lease related purposes, then it would be permissible and not a trespass.

While Hrabe has not centered his arguments on Crawford's actions as constituting a trespass which he is entitled to enjoin or for which he is entitled to collect damages, that is in great part the underlying basis for his complaints. As such, we will also consider additional cases which relate to intrusions of salt water in secondary recovery situations.

Even when no contractual rights exist between a property owner and an oil and gas lease operator, courts have been reluctant to apply the general rules of trespass to subsurface intrusions of migrating salt water. In *West Edmond Salt Water Disposal Ass'n v. Rosecrans,* 204 Okla. 9, 18, 226 P.2d 965 (1950), the Oklahoma Supreme Court refused to uphold an ejectment action and dam-

ages in favor of a property owner who complained of a subsurface intrusion of salt water from a nearby injection well where no actual damages had been shown. But, in *West Edmond Hunton Lime Unit v. Lillard*, 265 P.2d 730, 732 (Okla. 1954), the court permitted a property owner to recover actual damages for harm caused to him from subsurface salt water injected by an adjacent oil and gas lease operator. In *Mowrer v. Ashland Oil & Refining Co., Inc*, 518 F.2d 659, 662 (7th Cir. 1975), the court upheld the award of actual damages caused to plaintiff's property by a neighboring water flood project under a theory of private nuisance (the court noted the award could have been upheld on alternate theories). In *California Co. v. Britt*, 247 Miss. 718, 154 So. 2d 144 (1963), the court reversed a trial court's finding of trespass and damages for the displacement of oil from the plaintiff's property due to defendant's injections from another location under an approved unitization plan. The *Britt* court noted that it was one of the rare instances where the rule of capture applied. 247 Miss. at 727.

In *Railroad Commission of Texas v. Manziel*, 361 S.W.2d 560, 568 (Tex. 1962), a case we will discuss in more detail later in this opinion, the migration of injected salt water across plaintiff's property line was not considered an enjoinable trespass even where oil was displaced from the plaintiff's property, so long as the injection was part of an approved secondary recovery operation. In *Baumgartner v. Gulf Oil Corp.*, 184 Neb. 384, 394, 168 N.W.2d 510 (1969), citing to the logic of *Manziel*, the Nebraska Supreme Court held where the plaintiff whose oil had been displaced by injected salt water from neighboring properties refused to participate in a unitization program to his own detriment, the plaintiff was not entitled to damages for trespass in the amount of the displaced oil.

In *Tidewater v. Jackson*, 320 F.2d 157 (10th Cir. 1963), a Kansas case, the defendant sought and gained approval from the KCC for secondary recovery by use of a water flood program. While operating under the conditions of the approved plan, the defendant caused damage to the plaintiff's neighboring wells. Plaintiff's wells were still producing oil from primary pressure until defendant's water flood operations caused the wells to be overtaken by salt water. The court found no shield for tort liability offered by the

KCC's order and upheld the trial court's award of damages for lost profits. 320 F.2d at 163-64.

In 1 Williams and Meyers, Oil and Gas Law § 204.5 (1997), the authors note during a discussion of liability for the migration of salt water in secondary recovery operations: "The liability *vel non* of the injector to the adjoining landowner does not appear to turn upon the view held in the state as to the nature of the landowner's interest in oil and gas." While the cases reviewed generally involved the potential damages resulting from displacement of oil and gas by the waste water injections, which has not been proven in our present case, the authors discovered no cases where an injunction was permitted to stand to prevent further trespass where no damages had been shown. The authors concluded after a thorough review of the relevant case law: "It is hazardous, therefore, to engage in a secondary recovery program in the absence of unitization (voluntary or compulsory) of all premises *which may be adversely affected* by injection of fluids." (Emphasis added.) 1 Williams and Meyers § 204.5. Thus, the authors conclude that only in situations where adverse effects may occur to properties invaded by injected salt water, unlike our present facts, should a lessee be concerned with violating the rights of the estates affected by secondary recovery operations.

The case of *Manziel*, 361 S.W.2d 560, is an important holding relating to Hrabe's claims in this case. It involved competitive water flooding between two operators where one had received an exemption for the location of an injection well from the Texas Railroad Commission which was claimed to severely disadvantage the other. The well location was upheld. But, the decision is significant for the discussion of trespass in secondary recovery projects.

The *Manziel* opinion quotes from Williams and Meyers, Oil & Gas Law § 204.5 n.1, which in considering the legal consequence of secondary recovery injections in the subsurface states:

" 'What may be called a "negative rule of capture" appears to be developing. Just as under the rule of capture a land owner may capture such oil or gas as will migrate from adjoining premises to a well bottomed on his own land, so also may he inject into a formation substances which may migrate through the structure to

the land of others, even if it thus results in the displacement under such land of more valuable substances (e.g., the displacement of wet gas by dry gas).' "

In broadly discussing trespass in relation to secondary recovery, the court continued:

"Secondary recovery operations are carried on to increase the ultimate recovery of oil and gas, and it is established that pressure maintenance projects will result in more recovery than was obtained by primary methods. It cannot be disputed that such operations should be encouraged, for as the pressure behind the primary production dissipates, the greater is the public necessity for applying secondary recovery forces. It is obvious that secondary recovery programs could not and would not be conducted if any adjoining operator could stop the project on the ground of subsurface trespass. As is pointed out by amicus curiae, if the Manziels' theory of subsurface trespass be accepted, the injection of salt water in the East Texas field has caused subsurface trespasses of the greatest magnitude.

"The orthodox rules of and principles applied by the courts as regards surface invasions of land may not be appropriately applied to subsurface invasions as arise out of the secondary recovery of natural resources. If the intrusions of salt water are to be regarded as trespassory in character, then under common notions of surface invasions, the justifying public policy considerations behind secondary recovery operations could not be reached in considering the validity and reasonableness of such operations. See Keeton and Jones: 'Tort Liability and the Oil and Gas Industry II,' 39 Tex. Law Rev. 253 at p. 268. Certainly, it is relevant to consider and weigh the interests of society and the oil and gas industry as a whole against the interests of the individual operator who is damaged; and if the authorized activities in an adjoining secondary recovery unit are found to be based on some substantial, justifying occasion, then this court should sustain their validity.

"We conclude that if, in the valid exercise of its authority to prevent waste, protect correlative rights, or in the exercise of the powers within its jurisdiction, the Commission authorizes secondary recovery projects, a trespass does not occur when the injected, secondary recovery forces move across lease lines, and the operations are not subject to an injunction on that basis. The technical rules of trespass have no place in the consideration of the validity of the orders of the Commission." 361 S.W.2d at 568-69.

This decision, while thought to justify relaxing the rule of trespass in water flooding operations, when critically read, does not fully support Crawford's argument that an operator has the right to use the most economical water available even if objected to by the lessors.

This is not the last chapter in trespass discussions by the Texas Supreme Court. In *Geo Viking, Inc. v. Tex-Lee Operating Co.*, 817 S.W.2d 357 (Tex. Civ. App. 1991), the issue of trespass appeared in a case raising the rules of capture and trespass as they applied to hydraulic fracturing. Further analysis on our part is not helpful, but we point to the excellent article by Professor Jacqueline Lang Weaver entitled *The Politics of Oil and Gas Jurisprudence: The Eighty-Six Percent Factor*, 33 Washburn L.J. 492, 510-14, 523-25 (1994), where *Manziel* is criticized and *Geo Viking* is discussed.

In a case somewhat like *Robbins Petroleum Corporation, Inc.*, which we discussed earlier, the Oklahoma Supreme Court was asked to consider whether an actionable trespass had occurred where an operator took salt water from the plaintiff's property in order to increase production of a unit, of which plaintiff was a part and would directly benefit by increased unit royalties. *Holt v. Southwest Antioch Sand Unit, Fifth Enlarged*, 292 P.2d 998 (Okla. 1955). In *Holt*, the plaintiff sued for the profits created by the injection of salt water in surrounding leases. Part of the salt water had been produced from a former oil well on plaintiff's premises that had been converted without plaintiff's express permission. The plaintiff claimed that as the surface rights owner, she also retained title to the salt water and any unauthorized removal constituted a trespass. Without resolving the question of whether fresh water rights are applicable to salt water, the court found that the water was used to increase the production of oil and gas of the entire unit which by law constituted a single lease operation. The court upheld the dismissal of the plaintiff's action and opined that the operator had broad implied rights to accomplish the goal of oil and gas production:

"Whether the conveyance or reservation of the minerals provides therefor or not 'an owner of minerals may °°° use such amount of water from the land as is reasonably necessary to develop the mineral rights.' 58 C.J.S., Mines and Minerals, § 159, p. 334.

"In the case of *Stradley v. Magnolia Pet. Co.*, Tex. Civ. App., 155 S.W.2d 649, 652, the Texas Court said:

'The general rule seems to be that a person who owns the minerals in certain land has as incidental to his ownership the rights and privileges that are necessary for the profitable production of such minerals, and in determining his rights the

courts take into consideration the circumstances, the right conveyed, the purpose for which it was conveyed and the information of the grantor and grantee in order to ascertain the intention of the parties.' " 292 P.2d at 1000.

Extending the reasoning of *Holt*, it can be argued that if a surface owner does not have an action in trespass for the removal of salt water so long as it is done for the purpose of increasing the lessor's production, then neither would a cause of action for trespass lie where off-lease salt water is injected for the purpose of increasing production. As the *Holt* court noted, " 'a person who owns the minerals in certain land has as incidental to his ownership the rights and privileges that are necessary for the profitable production of such minerals.' " 292 P.2d at 1000.

While our discussion of trespass cases is helpful, it is not conclusive. We turn to consideration of the economics and practical usage of salt water or other water in a secondary recovery operation.

The record reflects that the injection of salt water was necessary in the case before us in order to sustain production, as the lease was near its economic limit of primary production. The KCC order, while not binding on the issues we face, found that waste would be prevented and additional recovery obtained by the secondary recovery project. The question then remains one of the source of the water to be used and the lessor's control or lack thereof over its source.

Hrabe is correct that the use of off-lease salt water is not required in order to complete the secondary recovery operation. A well or wells could be drilled into the Dakota aquifer on his property, and that water could be used in the secondary recovery operation. There is no evidence in the record as to the cost of drilling such a supply well, but it would obviously increase operating costs. Clearly, the most economically sound and prudent source of water is that which has already been produced from the same Kansas City formation on outside leases. Also, as stipulated by the parties, a geologist would testify that Kansas City formation water would be the best to use for production of oil. To establish a rule which prevents importation of water for secondary recovery, yet requires additional wells to be drilled on the lessor's premises to produce

water for the same purpose, would appear to undermine conservation, promote waste, and foster uneconomic actions.

The Ninth Annual Institute on Oil and Gas Law and Taxation published an article stating:

> "*A source of water is the most important single item in any water flood project.* The right to use water for lease operations is a right which is sometimes granted expressly in the ordinary oil and gas lease and implied when not granted in a conveyance or reservation . . . . As the use of water flooding becomes more widespread and the water supply of the country becomes more and more limited, as apparently it will, the problem will become even more important." (Emphasis added.) Hughes, *Operational Problems Arising Out of Secondary Recovery*, Ninth Annual Institute on Oil and Gas Law and Taxation 128 (1958).

Accord McElroy, *Water Flooding of Oil Reservoirs*, 7 Baylor L. Rev. 18, 27 (1955) ("Water is the most important single item in a water flood project.").

A finding that the use of off-lease water in the present case is not an enjoinable trespass is conceptually supported by the cases we have previously cited and the authors' comments concerning reasonable use of our water supply. Because the water supply in this country will become more and more limited, it should not be uselessly disposed of but rather should be used for the beneficial purposes of increasing oil production whenever possible.

We, like the trial court, do not believe that our decision should be reached on the language, or lack thereof, in the oil and gas lease involved in this case.

Hrabe's reliance on Professor Pierce's statement in the Kansas Oil and Gas Handbook § 12.05 (1991), that "the right to dispose of substances through injection wells and the right to conduct enhanced recovery operations, should also be addressed in agreements separate from the oil and gas lease" does not help us in deciding this appeal. It certainly would be to the parties' benefit if they had been able to resolve this matter by a separate agreement, but, the fact of the matter is, they could not do so. Nothing in the Handbook suggests secondary recovery cannot be an implied right in an oil and gas lease or that the most economical usage of salt water produced should not be encouraged.

We have previously cited Professor Weaver's article, *The Politics of Oil and Gas Jurisprudence: The Eighty-Six Percent Factor*, in 33 Washburn L.J. 492 (1994), as it relates to Texas cases involving trespass but the article also pointed out that had the Texas court adhered to the traditional rules of trespass it would have encouraged positive legislative action. The author argues that compulsory unitization of a production area is the best route in achieving conservation and economic results and a strict application of trespass jurisprudence would force unit operations.

Adoption of this view would run counter to our consistent reluctance to take judicial action to attempt to force a legislative response. In fact, the 1967 Kansas Legislature (in L. 1967, ch. 299, secs. 1-15) did enact provisions relating to unitization which are set forth in K.S.A. 55-1301 *et seq.* There is little doubt that if Crawford had obtained a KCC unitization order, Hrabe would appear to have no grounds to dispute the use of off-lease salt water on his property. He concedes such in his brief.

In the final analysis our decision must, as the trial court's was, be driven by the facts of this particular case. The secondary recovery operations have increased production. This increase is economically beneficial to all parties. Off-lease salt water is economically available. To drill a supply well on the Hrabe property would increase expenses of lease operations. The water from the Kansas City formation is more beneficial than water from the Dakota formation. This is a true injection of salt water necessary to increase production and not the disposal of water being attempted under the injection banner.

Limited to the facts of this case as all decisions must be, we hold the trial court reached the correct result.

The stipulation of the parties provided: "In the event the Court determines that secondary recovery operations of Plaintiff are lawful and authorized, damages shall be the actual and reasonable cost of pipeline repair." Because of the result we reach, this matter must be remanded to the trial court to make the necessary determination of damages to be awarded to Crawford.

Affirmed and remanded.