Nos. 100,846
100,847

LINDA WEBER, In Her Capacity as Marshall County Treasurer, *Appellee*, v. BOARD OF COUNTY COMMISSIONERS OF MARSHALL COUNTY, KANSAS, *Appellant*.

(221 P.3d 1094)

Opinion filed December 4, 2009.

*Brian S. Carroll*, county attorney, argued the cause and was on the brief for appellant.

*Darin M. Conklin*, of Alderson, Alderson, Weiler, Conklin, Burghart & Crow, L.L.C., of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: This is an appeal in two consolidated cases from the Marshall County District Court. Both lawsuits were filed by the county treasurer seeking equitable relief and damages against the Board of County of Commissioners of Marshall County. The centerpiece for this dispute is the money raised pursuant to K.S.A.

2008 Supp. 8-145 from fees paid by the public to the county treasurer to register and title motor vehicles. Both the Board and the county treasurer claim control over these funds.

The statute requires county treasurers to collect these motor vehicle fees on the state's behalf. It also requires the proceeds to be deposited into a statutorily-created special fund known as the motor vehicle fund. A portion of this money is set aside by law to help defray the county treasurer's office expenses for providing this locally-based processing service for the state. The statute also provides extra compensation for the county treasurer for overseeing the endeavor.

Our current controversy is a matter seemingly put to rest by this court 65 years ago in *Wyandotte County Comm'rs v. Ferguson*, 159 Kan. 80, 151 P.2d 694 (1944). In that case, the county commission attempted to control the county treasurer's payments from the special fund to satisfy motor vehicle registration expenses. Ruling in the county treasurer's favor and against the county commission's attempt to inject itself into the process for authorizing special fund payments, this court described the nearly identical statutory language as follows:

"We find no ambiguity whatever in section 8-145 as to the handling of the fees by the county treasurer or as to the status of that portion retained by [the county treasurer] for administrative purposes, or as to where the legislature lodged administrative responsibility. *No words could be clearer or more definite.*" (Emphasis added.) 159 Kan. at 85.

Nevertheless, issues persisted in our state. See Att'y Gen. Op. No. 91-65 (answering whether a board of county commissioners may set a county treasurer's salary based on the amount that official will receive from the state pursuant to K.S.A. 1990 Supp. 8-145); Att'y Gen. Op. No. 82-76 (answering whether a county treasurer solely determines the salary of staff provided for by K.S.A. 8-145[b] and whether a board of county commissioners has any authority over K.S.A. 8-145[b] operations); Att'y Gen. Op. No. 80-206 (answering whether a county treasurer is authorized under special circumstances as provided by law to disburse county funds without a board of county commissioners' permission); and Att'y Gen. Op. No. 79-74 (answering whether a county treasurer may pay staff

bonuses from the motor vehicle fund for overtime and whether the board of county commissioners may stop payment for staff paychecks drawn on the motor vehicle fund). We again address the question in the hope of reinvigorating the *Ferguson* court's holdings and providing further guidance for county officials.

The district court in this case enjoined the Board from: (1) directly or indirectly spending, allocating, or directing money from the motor vehicle fund to pay for the county treasurer's salary for county services performed on behalf of Marshall County; and (2) directing or requiring the county treasurer to use a purchase order process to give the Board preapproval control over the treasurer's acquisition of equipment or supplies purchased through the motor vehicle fund. We affirm those rulings. A third order entered against the Board is unchallenged on appeal. It prohibits the Board from restricting the county treasurer's ability to hire, fire, or otherwise administer the county treasurer's duties or the personnel employed in the county treasurer's office pursuant to K.S.A. 8-145 and K.S.A. 19-501 *et seq*.

We also affirm the district court's order that Weber is entitled to be paid $10,200 for her motor vehicle registration work in 2007 as required by K.S.A. 8-145(b). This amount represents the extra compensation directed by statute to the county treasurer under a statutory formula, as determined by the district court. That money is paid from the motor vehicle fund not the county's general fund. But we reverse the district court's factual finding that the Board intended to set the county treasurer's 2007 salary at $33,780 for her county-based responsibilities. The attendant order that this amount be paid to the county treasurer from the county general fund is set aside. The district court's judgment in this respect is unsupported by the evidence.

We remand the case with instructions that the district court enter orders consistent with this opinion to ensure the Board sets the county treasurer's county salary based upon the nature and scope of the county treasurer's responsibilities to the county, without any consideration for the extra compensation to be paid pursuant to K.S.A. 2008 Supp. 8-145. When that is accomplished, the district court is to enter judgment in Weber's favor in such amount as will

be sufficient to pay the compensation she is entitled to for her county responsibilities. Additional matters will be discussed and decided in context.

## FACTUAL AND PROCEDURAL BACKGROUND

### Statutory Directives for Motor Vehicle Registration

Motor vehicle registration and titling is required by state law. K.S.A. 8-126 *et seq.* As part of this statutory system, all prescribed fees for annual motor vehicle registrations and certificates of title must be paid to the county treasurer of the county in which the applicant resides or has an office or principal place of business within the state. K.S.A. 2008 Supp. 8-145(a). The county treasurer collects these fees on the state's behalf and processes the registrations and titles in the manner required by law and regulation.

In exchange for these services, state law authorizes county treasurers to withhold a portion of the collected revenue to offset expenses and pay compensation. K.S.A. 2008 Supp. 8-145(b). The remainder is remitted to the Secretary of Revenue, who in turn deposits those proceeds into the state treasury. K.S.A. 2008 Supp. 8-145(c). The controversy here revolves around the fees a county treasurer withholds.

The pertinent statutory provisions are found in K.S.A. 2008 Supp. 8-145(b), which states:

"The county treasurer shall deposit $.75 of each license application, $.75 out of each application for transfer of license plate and $2 out of each application for a certificate of title, collected by such treasurer under this act, *in a special fund, which fund is hereby appropriated for the use of the county treasurer in paying for necessary help and expenses incidental to the administration of duties in accordance with the provisions of this law and extra compensation to the county treasurer for the services performed in administering the provisions of this act, which compensation shall be in addition to any other compensation provided by any other law,* except that the county treasurer shall receive as additional compensation for administering the motor vehicle title and registration laws and fees, a sum computed as follows: The county treasurer, during the month of December, shall determine the amount to be retained for extra compensation not to exceed the following amounts each year for calendar year 2006 or any calendar year thereafter: The sum of $110 per hundred registrations for the first 5,000 registrations; the sum of $90 per hundred registrations for the second 5,000 registrations; the sum of $5 per hundred for the third 5,000 registrations; and the sum of $2

per hundred registrations for all registrations thereafter. In no event, however, shall any county treasurer be entitled to receive more than $15,000 additional annual compensation.

"If more than one person shall hold the office of county treasurer during any one calendar year, such compensation shall be prorated among such persons in proportion to the number of weeks served. The total amount of compensation paid the treasurer together with the amounts expended in paying for other necessary help and expenses incidental to the administration of the duties of the county treasurer in accordance with the provisions of this act, shall not exceed the amount deposited in such special fund. *Any balance remaining in such fund at the close of any calendar year shall be withdrawn and credited to the general fund of the county prior to June 1 of the following calendar year.*" (Emphasis added.)

As seen from these provisions, the legislature directs how the money remaining with the county treasurer is to be handled by specifying: (1) The funds are to be deposited into a special fund; (2) this special fund is appropriated by the legislature for the county treasurer's use to pay for necessary help and expenses incidental to administering the act and to pay extra compensation to the county treasurer; (3) the extra compensation paid is to be in addition to any other compensation provided to county treasurers by any other law; (4) the extra compensation is set by a statutory formula, based on the transactions processed, capped at $15,000; (5) the extra compensation cannot exceed the money in the special fund; and (6) if there is any balance remaining in the special fund at the calendar year's end, it will be transferred to the county general fund.

The statute was enacted in 1929. Initially, the law provided the local fee share collected by the county treasurer was credited directly to the county general fund, with the remainder transferred to the state treasurer for deposit into the highway fund. L. 1929, ch. 81, sec. 23. But in 1937, the law was amended to eliminate the deposit of the local share into the county general fund. Instead, a special fund was created to receive the proceeds dedicated for local use. This special fund then was appropriated for the county treasurer's use in administering the statutory duties for vehicle registration and titling. L. 1937, ch. 72, sec. 8. In 1947, a provision was added granting county treasurers extra compensation for the additional duties performed on the state's behalf. L. 1947, ch. 97, sec.

1. Notably, the 1947 amendments gave county commissioners in counties with a population exceeding 3,000 the authority to set the county treasurer's extra compensation from the special fund up to a specified maximum. This authority was repealed in 1968 in favor of having the legislature set the extra compensation under a statutory formula. L. 1968, ch. 335, sec. 1. Subsequent amendments enhanced the local fee share and the county treasurer's extra compensation. See L. 1990, ch. 34, sec. 4; L. 1985, ch. 45, sec. 1; L. 1969, ch. 49, sec. 1. The compensation formula increased most recently in 2006. L. 2006, ch. 136, sec. 5.

*The Marshall County Dispute*

As it does each year, the Board in early 2007 established salaries for all elected county officials for that calendar year. During discussions about the county treasurer's pay, the Board noted the 2006 amendment to K.S.A. 8-145 increased the county treasurer's extra compensation from the motor vehicle fund. The Board then approved a motion setting salaries for the county's elected officials, the pertinent part of which states "[the] County Treasurer's salary from general/motor vehicle [is set] in the amount of $33,780.00 *with $23,580.00 out of the General Fund and $10,200.00 out of the Motor Vehicle fund.*" (Emphasis added.)

Regarding this motion, the parties stipulate it was the Board's intention to reduce the county's obligation to the county treasurer from its general fund for her county responsibilities by an amount equivalent to the anticipated increase in the county treasurer's state motor vehicle fund compensation resulting from the 2006 amendment to K.S.A. 8-145. This intention was realized because the facts show that in 2006 the county general fund contributed $27,840 toward the county treasurer's salary, but in 2007 the county's general fund share was reduced to $23,580.

The county treasurer objected to this methodology, arguing the Board was using state motor vehicle funds to supplant county general funds and denying her the extra compensation specified by state law. She noted the net result from the Board's action, excluding a county-wide cost-of-living increase of $600, was to reduce her salary derived from the county general fund by $4,860, an

amount corresponding to what she expected to receive from the new statutory raise in motor vehicle fund compensation.

On October 18, 2007, Weber filed her first lawsuit against the Board in the Marshall County District Court seeking declaratory judgment, quo warranto, mandamus, injunction, and damages regarding her salary and the requirements for extra compensation spelled out in K.S.A. 8-145. She sought orders requiring the Board to compensate her from the county general fund for her full salary of $33,780 from January 1, and prohibiting the Board from establishing her county salary based upon the extra compensation under K.S.A. 8-145 for motor vehicle registration and titling.

The facts giving rise to the second lawsuit began on October 29, 2007, when Weber provided the Board with a courtesy notice that her office intended to purchase computer printers to assist it in performing its state motor vehicle registration duties. The notice indicated the printers would be purchased using the motor vehicle fund and not the county general fund. On December 7, Weber directed a warrant be issued against the motor vehicle fund for the purchase. This was the procedure she used for motor vehicle fund expenditures throughout her tenure as county treasurer without previous Board objection.

But the Board stopped the warrant from issuing on December 10 and declared Weber needed to obtain the Board's express approval in the future before spending any money from the motor vehicle fund. The parties agree this was the first time the Board ever interfered with the county treasurer's expenditures from the motor vehicle fund. The Board's timing appears retaliatory for the first lawsuit.

On December 18, 2007, Weber filed her second action seeking declaratory and injunctive relief to prevent the Board from controlling expenditures from the motor vehicle fund. Sometime later, the Board withdrew its restriction on the computer printer purchase, but persisted with the legal issue and continued arguing the Board controlled the county treasurer's access to the motor vehicle fund.

These issues were tried to the district court on stipulated facts and arguments of counsel. Relying on *Ferguson*, the lower court

found the statute was plain and unambiguous. The law, the district court ruled, vests the county treasurer with authority to administer and use the motor vehicle fund without interference or usurpation from the Board. The district court continued, stating:

"The Kansas legislature has at no time, authorized [the Board] to have access, control or dispositional authority over the Motor Vehicle Fund except as to the balance of the Motor Vehicle Fund which remains at the conclusion of the calendar year, and which is thereafter paid over to the Defendant's general fund on or before the next June 1st. The [Board's] interest vests only at the conclusion of the calendar year, after payment of the necessary expenses for help and incidental items relative to the administration of the motor vehicle laws and the payment of extra compensation to the [county treasurer]."

As to the county treasurer's salary, as set by the Board, the district court held:

"[The Board] established [the county treasurer's] county salary for 2007 by resolution on January, 22, 2007, at $33,780.00. [The Board] has admitted that [the county treasurer] has performed all of her duties for Marshall County and earned her full county salary relative to such duties. *[The Board] must establish and pay that salary for those duties only from the county general fund.* The compensation to be derived by [the county treasurer] from the Motor Vehicle Fund is to be in addition to that compensation set by the [Board]. [The Board] has no legislative, statutory or inherent power to utilize the Motor Vehicle Fund to pay [the county treasurer's] salary. The Court finds that [the Board's] actions of January 22, 2007 authorizing payment from the Motor Vehicle Fund relative to [the county treasurer's] salary, constitutes an unlawful appropriation of the Motor Vehicle Fund by [the Board]." (Emphasis added.)

On the strength of these findings, the district court ordered the Board to pay Weber $33,780 from the county general fund as her county salary for 2007. The district court further ordered the Board "recredit" $10,200 to the motor vehicle fund, ruling that this money was misappropriated by the Board, and then ordered the $10,200 "be made available to [Weber] as additional and extra compensation to the extent compliant with K.S.A. 8-145." The district court's order in effect set the county treasurer's compensation from all sources for 2007 at $43,980.

The district court issued permanent injunctions, as noted above, prohibiting the Board from: (1) using motor vehicle funds to finance the county treasurer's salary for services performed on the

county's behalf; (2) controlling the county treasurer's official duties or personnel contrary to K.S.A. 19-503; and (3) controlling the county treasurer's purchases through the motor vehicle fund. The Board timely appealed from the district court's injunctions as to the Board's authority in setting the county treasurer's salary and the Board's control over expenditures from the motor vehicle fund. The Board also appealed the court's order to pay the county treasurer's full $33,780 salary from the county general fund.

The appeals from each case were consolidated. This court transferred the consolidated appeal from the Court of Appeals. See K.S.A. 20-3018(c) (transfer on court's own motion).

### ANALYSIS

After stating our standard of review, we will address first the constitutional and statutory roles played by boards of county commissioners and county treasurers. With that background, we will address each challenge to the district court's decision raised by the Board. In the context of those arguments, we will discuss the motor vehicle registration statutes and this court's decision in *Ferguson,* which was the last time we rejected an attempt by county commissioners to gain control over the motor vehicle fund.

*Standard of Review*

This case's resolution depends upon a statutory interpretation of K.S.A. 2008 Supp. 8-145, which presents a question of law over which we have unlimited review. See *Double M. Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). When interpreting a statute, this court must give ordinary words their ordinary meaning. 288 Kan. at 271. Further, if the statute is plain and unambiguous, the court need not speculate as to legislative intent or resort to statutory construction. 288 Kan. at 271 (quoting *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 [2007], *cert. denied* 172 L. Ed. 2d 239 [2008]).

In addition, in cases decided on stipulated facts, such as this one, an appellate court has " 'as good an opportunity to examine and consider the evidence as did the court below, and to determine de novo what the facts establish.' " *Crawford v. Hrabe*, 273 Kan. 565,

570, 44 P.3d 442 (2002) (quoting *Heiman v. Parrish*, 262 Kan. 926, 927, 942 P.2d 631 [1997]). Under this rationale, the court is free to review the stipulated facts and draw its own conclusions.

*County Authority*

The Kansas Constitution empowers the legislature to organize counties and to delegate local legislative and administrative powers to political subdivisions. Kan. Const. art. 2, § 21, art. 9, §§ 1, 2, and 5. Counties are political subdivisions of the state. *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 414, 636 P.2d 760 (1981). Further, each organized county within the state is a body corporate and politic, may sue and be sued, and each has home rule powers. K.S.A. 19-101. The legislature established a board of county commissioners in each county to exercise county powers. K.S.A. 19-103. This board must annually prepare the county's budget. K.S.A. 79-2927. This board also is authorized to examine and settle all accounts or receipts and expenses of its county, and a board has "exclusive control of all expenditures accruing . . . [including] any other county expenditures." K.S.A. 19-212; K.S.A. 19-229.

Because a board has such expansive authority regarding county governance, this court's review of a board's actions is limited and depends upon the conduct at issue. In governing its county, a board makes legislative, administrative, judicial, or quasi-judicial decisions. *Umbehr v. Board of Wabaunsee County Comm'rs*, 252 Kan. 30, 33, 843 P.2d 176 (1992). Setting a county official's salary is an administrative action. See *Brelsford & Gifford Co. v. Smith County Comm'rs*, 139 Kan. 339, 341-42, 31 P.2d 25 (1934); *Concannon v. Board of Linn County Comm'rs*, 6 Kan. App. 2d 20, 626 P.2d 798, *rev. denied*, 229 Kan. 669 (1981).

A court may review a board's administrative actions if they are illegal, as alleged here. *Umbehr*, 252 Kan. at 36. Finding illegality in official conduct "relates to the procedural aspects of the proceedings and the determination of whether the action taken was within the authority of the agency or board." 252 Kan. at 36-37. Such actions generally are judicially reviewed through extraordi-

nary remedies such as quo warranto, mandamus, declaratory judgments, and injunctions. 252 Kan. at 36.

*County Treasurer's Duties*

A county treasurer has both county and state duties imposed upon that office by law. The county duties are provided in K.S.A. 19-501 *et seq*. They include receiving and disbursing money, maintaining an account of receipts and expenditures, preparing financial reports, paying and redeeming county warrants, and collecting taxes. K.S.A. 19-501 *et seq*. When requested by the county commission, a county treasurer must submit to a surprise cash count or provide an immediate accounting of the books. K.S.A. 19-506; K.S.A. 19-507.

A county treasurer's state duties are found in K.S.A. 8-143 *et seq*. The primary state responsibility is the one at issue here — processing motor vehicle registrations and certificates of title and transferring the proceeds received from fees charged for such registration. K.S.A. 2008 Supp. 8-145. A county treasurer also is charged with paying for necessary help and expenses incidental to the administration of these responsibilities. K.S.A. 2008 Supp. 8-145(b). To offset these costs, the county treasurer is permitted by statute to hold back a specified portion from fee proceeds. K.S.A. 2008 Supp. 8-145(b).

In this case, the parties stipulated as to the time commitments required from Weber to perform her county and state responsibilities. This stipulation noted the county treasurer is charged with "a multitude of duties on behalf of Marshall County" performed "during and outside of posted business hours." Similarly, the parties agreed the county treasurer's duties on the state's behalf were "separate and distinct" from those performed for the county. The stipulation also provided that Weber's state duties were performed during and outside of posted business hours. Notably, the parties further stipulated:

"[The county treasurer's] commitment of time and effort relative to her county duties does not lessen by virtue of her obligation to perform duties on behalf of the State of Kansas. The volume of county services for which [the county trea-

surer] is responsible has increased in recent years, while at the same time, [the county treasurer's] duties relative to the State of Kansas have also increased."

*County Treasurer Control Over the Motor Vehicle Fund*

The Board argues it controls purchases made by the country treasurer from the motor vehicle fund. The Board notes state law generally gives it exclusive domain over county finances under K.S.A. 19-229 (settling county accounts); K.S.A. 19-212 (exclusive control of county expenditures); and K.S.A. 79-2925 *et seq.* (control of county budget). The Board raises additional arguments regarding statutory checks and balances under K.S.A. 19-506 and K.S.A. 19-507, as well as miscellaneous arguments regarding the board's overall interest in county property and potential violations of the cash-basis law. On the other hand, Weber argues the plain language in K.S.A. 2008 Supp. 8-145(b) is specific as to the motor vehicle fund and that this specificity controls over arguments framed by the Board about its general statutory authority. The county treasurer is correct.

K.S.A. 2008 Supp. 8-145(b) directly counters the Board's position. It creates a special fund for the deposit of the local share of proceeds from vehicle registrations and titling and then specifies who controls disbursements from the fund and for what purpose. The statutory language provides this special fund "is hereby appropriated *for the use of the county treasurer* in paying for necessary help and expenses incidental to the administration of duties in accordance with the provisions of this law." (Emphasis added.) No role is provided for the Board while that money is in the special fund. There is no statutory basis for the Board to claim otherwise.

As noted above, this court reviewed the same statutory language in the same context 65 years ago, and concluded, "[n]o words could be clearer or more definite." *Ferguson*, 159 Kan. at 85. In that case, as is the one before us now, the county commission claimed authority over the special fund. This court rejected that claim and stated, "it is perfectly clear that the treasurer and not the board is charged with administrative responsibilities under the act." 159 Kan. at 85. The court then noted the county treasurer's administrative responsibilities included control over the special fund.

As to the county commission's contentions that other statutes giving the board general authority over county purchasing and county funds also applied to the motor vehicle fund, this court noted statutes regarding specific subjects control over those with more general application. This court concluded, "[c]learly 8-145 makes 'special provision' for payment of expenses by the treasurer out of the special fund." 159 Kan. at 86. Accordingly, the court found K.S.A. 8-145 controlled over the county commission's more general statutory authority.

Finally, the *Ferguson* court held the language in K.S.A. 8-145 demonstrated the county's only financial interest in motor vehicle registration and titling fees was if the special fund had a balance at calendar year's end. The court found, "[t]his clearly indicates the legislative intent that no part of the fees shall be considered as part of the general funds of the county." *Wyandotte County Comm'rs v. Ferguson*, 159 Kan. 80, 86, 151 P.2d 694 (1944).

The *Ferguson* court's analysis remains valid. The statutory language at issue in that case is nearly identical to the language now before this court. We find K.S.A. 2008 Supp. 8-145 gives the Board no interest in the motor vehicle fund whatsoever, except a contingent interest at the end of a calendar year, if any proceeds remain after the county treasurer fulfills the state responsibilities for motor vehicle registration and titling set out in the statutes. There is nothing in the statute giving the Board any authority to approve, reject, or modify motor vehicle fund expenditures.

We also reject the Board's contention that its oversight promotes appropriate expenditures from the fund. Indeed, to give the Board the approval authority it is arguing for would embed a conflict of interest into this statute because the Board could frustrate spending from the special fund simply to safeguard for itself an ending year balance for transfer to the county's general fund, which the Board controls. This would put the county's interests above the state's and subordinate the statutory purposes for efficient administration of motor vehicle registration and titling.

The legislature protects against such a conflict of interest by expressly appropriating the special fund for the county treasurer's use in paying for necessary help and expenses incidental to admin-

istering the motor vehicle registration statutes. We will not read into the statute provisions that could so easily subvert the law's obvious purposes. As stated in *Ferguson*, a board's interest does not attach unless there is a balance in the special fund at the end of the calendar year. Until that time, a board plays no part in the special fund's administration. 159 Kan. at 85.

The district court was correct to find the county treasurer alone is statutorily vested with the authority to administer and use the motor vehicle fund without interference or usurpation by the Board. The district court's ruling is consistent with the plain language in the statute and this court's decision in *Ferguson*. We affirm the district court's order enjoining the Board from attempting to impose a preapproval process over the county treasurer's expenditures from the motor vehicle fund.

*The County Treasurer's Salary*

In 1947, the legislature added language to K.S.A. 8-145(b) providing "extra compensation to the county treasurer for the services performed by [the county treasurer] in administering the provisions of this act, which compensation shall be in addition to any other compensation provided by any other law." L. 1947, ch. 97, sec. 1. The statute directs this extra compensation be paid from the special fund in accordance with a statutory formula. As noted above, the legislature adjusted the formula from time to time, most recently in 2006, to increase the extra compensation for county treasurers. L. 2006, ch. 136, sec. 5. Language giving the board of county commissioners in counties with populations exceeding 3,000 some authority over the amount of extra compensation received by a county treasurer was stricken more than 40 years ago in favor of letting the statutory formula control. L. 1968, ch. 335, sec. 1.

The stipulated facts are that the Board set Weber's 2006 salary at $33,180 with that total sum to be paid partially from county general funds ($27,840) and motor vehicle funds ($5,340). This was an acknowledgment that the county treasurer performs distinct responsibilities for both the county and the state, as discussed above. But there is an additional stipulation that the Board never ascer-

tained what proportion of the county treasurer's time is split between county and state duties. The parties advised the district court that Weber's county and state responsibilities each increased in recent years. There was no other study or analysis performed to determine how much time the county treasurer was expending on behalf of the county or the state.

Nevertheless, the facts are that when the Board set Weber's 2007 salary it intended to reduce the county's general fund obligation by an amount equivalent to the anticipated increase in Weber's motor vehicle fund extra compensation provided by the 2006 amendment to K.S.A. 8-145. See L. 2006, ch. 136, sec. 5. The results reflect this intention because the county's general fund obligation for Weber's salary dropped from $27,840 in 2006 to $23,580 in 2007. This savings to the county corresponds exactly with Weber's projected increase in motor vehicle fund extra compensation, less a $600 annual increase the county gave all its elected officials. Weber obviously did not get the benefit from the 2006 statutory increase provided in the law.

The legal question then is whether the statutory language in K.S.A. 2008 Supp. 8-145 permits the Board to siphon away the monetary benefit flowing from the pay increase the legislature approved. To answer this, we need look no further than the statute's plain language. It characterizes the county treasurer's compensation under the formula as "extra" and expressly states this stipend *"shall be in addition to* any other compensation provided by any other law." (Emphasis added.) It certainly does not provide that the additional funding is to supplant the county's general fund and divert the benefit specified in the law from the county treasurer.

The Board argues there is no law requiring county treasurers actually receive the extra compensation provided for in K.S.A. 2008 Supp. 8-145, but the Board is wrong. The statute specifies the extra compensation is to be in addition to any other compensation received by county treasurers under any other law, not a replacement for other compensation. It is impossible for the extra compensation to be in addition to any other compensation if it is first subtracted from other money a county treasurer earned performing other responsibilities. The Board's argument is without merit.

We hold it was improper for the Board to consider the county treasurer's extra compensation from the motor vehicle fund when it calculated her 2007 salary for her county responsibilities, which it clearly did in this case. We affirm the district court's ruling that the county contravened the law by using the extra compensation authorized by K.S.A. 8-145(b) to replace county general funds otherwise payable to the county treasurer as salary for her county responsibilities. The Board's action subverted the legislative intent to give the county treasurer the benefit of additional compensation for processing motor vehicle registrations and titling. The district court's order preventing the Board from using the motor vehicle fund to finance any portion of the county treasurer's county salary was correct. We also affirm the district court's order that Weber is entitled to be paid $10,200 for her motor vehicle registration work in 2007 as required by K.S.A. 8-145(b).

But this does not complete our inquiry regarding the county treasurer's salary. The district court made an additional factual determination that is not supported by the evidence. The district court found the Board intended to set the county treasurer's "county salary" for 2007 at $33,780. The district court premised its remedy on this finding and ordered the Board to pay that amount from the county general fund only. The effect of this was to give the county treasurer a 2007 salary of $33,780 for her county responsibilities, payable entirely from county funds, plus $10,200 from the motor vehicle fund under K.S.A. 8-145(b).

The facts do not support the district court's finding that the Board intended to pay the county treasurer $33,780 for performing her county responsibilities. As discussed above, the Board's formal resolution setting salaries for elected county officials plainly identified the county treasurer as an official who was to be paid out of multiple funds for multiple purposes. It provided her total salary would be $33,780, with $23,580 paid for by the county general fund and $10,200 by the motor vehicle fund. Similarly, the exhibit attached to the parties' stipulation of fact, entitled "2007 Elected Officials Wage Scale," showed the same salary composition for the county treasurer from the two funds. It was error for the district court to conclude from this exhibit that the entire $33,780 was

intended by the Board to come from county general funds and must be paid from those general funds.

We find the record before us is inadequate to demonstrate what county salary the Board would have set for Weber's county responsibilities had it not contaminated its deliberations with its overriding desire to misappropriate state motor vehicle funds for the Board's own purposes. The Board conceded by stipulation that it never ascertained what proportion of time the county treasurer devoted to county and state responsibilities. It further conceded Weber's county and state duties each increased in recent years. But the Board never determined an appropriate base salary to ensure the county treasurer was fairly paid for county work. Based on this record, it was error for the district court to conclude the Board intended to compensate Weber $33,780 for her county salary and then direct the Board to pay that amount from the county general fund.

At oral arguments the parties' counsel acknowledged it would be possible for the Board to ascertain and allocate the county treasurer's time commitment for performing county functions and then set an appropriate salary for her on that basis. While other approaches may be valid also, such a study, if accurately and fairly conducted and followed, could provide the factual basis upon which the Board could demonstrate that it lawfully set the county treasurer's salary for her county responsibilities. We remand the case on this limited aspect with directions to the district court to ensure the Board sets the county treasurer's county salary without any consideration for the extra compensation to be paid pursuant to K.S.A. 2008 Supp. 8-145.

The district court may accomplish this by giving the parties an opportunity to reach agreement as to what the appropriate compensation should be, or by allowing the Board to measure and set the county treasurer's salary for her county responsibilities without considering the extra compensation under K.S.A. 2008 Supp. 8-145(b), or both. But if the Board resets the salary and Weber wishes to challenge whether the reconstituted salary is lawful, such dispute will need to be resolved by the district court in further proceedings.

When finally accomplished, judgment is to be entered in Weber's favor and against the Board in such amount as will be sufficient to pay her the compensation she is entitled to receive for her county responsibilities.

The district court's judgment is affirmed in part, reversed in part, and remanded with directions.

\* \* \*

JOHNSON, J., concurring: I wholeheartedly agree with the majority. I write separately only to express my opinion that any after-the-fact attempt by the Board to reduce the treasurer's 2007 county salary below the level paid in 2006 would be highly suspect, if not disingenuous.

Clearly, the Board intended to give all county employees a $600 raise in 2007. The treasurer's 2006 county salary was $27,840. Adding the $600 across-the-board cost-of-living increase would have made her 2007 county salary $28,440, if the Board had not usurped the 2007 increase in motor vehicle funds. The Board did not allege that Weber's performance warranted a pay reduction. It readily admitted that the quantity of the treasurer's work on behalf of the county has increased. Accordingly, I would view any county salary less than $28,440 to be an attempt by the Board to do indirectly what it is prohibited to do directly, *i.e.*, to appropriate motor vehicle funds for county use.